United States Code   Effective: October 19, 2009
Title 18. Crimes and Criminal Procedure
Part II. Criminal Procedure
Chapter 223. Witnesses and Evidence
§ 3512. Foreign requests for assistance in criminal investigations and prosecutions

(a) Execution of request for assistance.--

(1) In general.--Upon application, duly authorized by an appropriate official of the Department of Justice, of an Attorney for the Government, a Federal judge may issue such orders as may be necessary to execute a request from a foreign authority for assistance in the investigation or prosecution of criminal offenses, or in proceedings related to the prosecution of criminal offenses, including proceedings regarding forfeiture, sentencing, and restitution.

(2) Scope of orders.--Any order issued by a Federal judge pursuant to paragraph (1) may include the issuance of--

(A) a search warrant, as provided under Rule 41 of the Federal Rules of Criminal Procedure;

(B) a warrant or order for contents of stored wire or electronic communications or for records related thereto, as provided under section 2703 of this title;

(C) an order for a pen register or trap and trace device as provided under section 3123 of this title; or

(D) an order requiring the appearance of a person for the purpose of providing testimony or a statement, or requiring the production of documents or other things, or both.

(b) Appointment of persons to take testimony or statements.--

(1) In general.--In response to an application for execution of a request from a foreign authority as described under subsection (a), a Federal judge may also issue an order appointing a person to direct the taking of testimony or statements or of the production of documents or other things, or both.

(2) Authority of appointed person.--Any person appointed under an order issued pursuant to paragraph (1) may--

(A) issue orders requiring the appearance of a person, or the production of documents or other things, or both;

(B) administer any necessary oath; and

3512 MLA APP; LLP 2009 DEC

(C) take testimony or statements and receive documents or other things.

(c) Filing of requests.--Except as provided under subsection (d), an application for execution of a request from a foreign authority under this section may be filed--

(1) in the district in which a person who may be required to appear resides or is located or in which the documents or things to be produced are located;

(2) in cases in which the request seeks the appearance of persons or production of documents or things that may be located in multiple districts, in any one of the districts in which such a person, documents, or things may be located; or

(3) in any case, the district in which a related Federal criminal investigation or prosecution is being conducted, or in the District of Columbia.

(d) Search warrant limitation.--An application for execution of a request for a search warrant from a foreign authority under this section, other than an application for a warrant issued as provided under section 2703 of this title, shall be filed in the district in which the place or person to be searched is located.

(e) Search warrant standard.--A Federal judge may issue a search warrant under this section only if the foreign offense for which the evidence is sought involves conduct that, if committed in the United States, would be considered an offense punishable by imprisonment for more than one year under Federal or State law.

(f) Service of order or warrant.--Except as provided under subsection (d), an order or warrant issued pursuant to this section may be served or executed in any place in the United States.

(g) Rule of construction.--Nothing in this section shall be construed to preclude any foreign authority or an interested person from obtaining assistance in a criminal investigation or prosecution pursuant to section 1782 of title 28, United States Code.

(h) Definitions.--As used in this section, the following definitions shall apply:

(1) Federal judge.--The terms "Federal judge" and "Attorney for the Government" have the meaning given such terms for the purposes of the Federal Rules of Criminal Procedure.

(2) Foreign authority.--The term "foreign authority" means a foreign judicial authority, a foreign authority responsible for the investigation or prosecution of criminal offenses or for proceedings related to the prosecution of criminal offenses, or an authority designated as a competent authority or central authority for the purpose of making requests for assistance pursuant to an agreement or treaty with the United States regarding assistance in criminal matters.

3512 MLA APP; LLP 2009 DEC

(Added Pub.L. 111-79, § 2(4), Oct. 19, 2009, 123 Stat. 2087.)
18 U.S.C.A. § 3512, 18 USCA § 3512
Current through P.L. 111-86 (excluding P.L. 111-84) approved 10-29-09

3512 MLA APP; LLP 2009 DEC



**U.S. Department of Justice**

*Criminal Division*

MEW:LGB:DAJ:cq
DOJ No.: 182-33345

Department of Justice Attaché
  for Criminal Matters
American Embassy – London
24 Grosvenor Square
London W1A 1AE

Direct:  [+44] 20 7894 0710
Fax:    [+44] 20 7894 0401
Email:  JeffressDA@state.gov

September 26, 2011

**Via Electronic Mail**

Judy Philips
Assistant United States Attorney
U.S. Attorney's Office
271 Cadman Plaza East
Brooklyn, NY 11201

Re:    **Original and Supplemental Requests for Assistance from the United Kingdom
in the Matter of Operation Lumpfish (Siobhan Louise Clarke)**

Dear Judy:

Attached are an original and a supplemental request from the United Kingdom (UK) for legal assistance in a foreign criminal matter. The United States is obligated to assist in such matters pursuant to the Instrument between the United States and the UK, signed December 16, 2004, implementing the Agreement on Mutual Legal Assistance between the United States and the European Union, signed June 25, 2003. This request should be executed pursuant to that treaty, and a commissioner should be appointed for this purpose pursuant to 18 U.S.C. § 3512. Consistent with the requirements of 18 U.S.C. § 3512, your office is hereby authorized to make an application to the District Court for the Eastern District of New York seeking all the necessary orders, including those set out with more specificity below, and to take other steps necessary to execute the request.

The Facts

The Crown Prosecution Service (CPS), supported by the Metropolitan Police E-Crime Unit, is prosecuting Siobhan Louise Clarke and others for fraud and money laundering offenses.

The attached original and supplemental requests provide a full description of the facts of the case. The investigation began with a referral from the District Attorney's Office in Kings County, New York, based on complaints from Apple and Amazon. In summary, the conspirators sold music tracks to online music management companies, who in turn arranged for the music tracks to be sold on websites such as iTunes and Amazon. The conspirators then used compromised US and UK

credit cards to purchase the tracks from iTunes and Amazon. Each sale generated a royalty payment, which iTunes and Amazon then paid to the online music management company, who, in turn, made payments to various Paypal accounts held by the conspirators. The conspirators then transferred those funds from the Paypal accounts to the conspirators' bank accounts. In one instance, approximately $300,000 of royalty payments were made to the conspirators before the fraud was discovered.

The defendants were charged with conspiracy to defraud in August 2010. Craig Anderson, Arron Jassi, and Lamar Johnson pled guilty and were sentenced. The remaining defendants are scheduled for trial in January, 2012. The CPS would like to obtain the requested evidence in time for a pre-trial hearing on October 31, 2011, if possible.

Request for Assistance

The original request seeks records from Apple, Amazon, and three other companies, as listed on pages 9-10. **Many of these records have already been provided by Kings County Assistant District Attorney Steven Kramer.** Please coordinate with ADA Kramer in order to obtain any additional records sought and any certifications needed in order for this evidence to be admissible in the UK.

The supplemental request asks for additional certified business records from CD Baby in Portland, Oregon, and Songcast in Cuyahoga Falls, Ohio, as set forth on pages 4-5. Please note that while the UK authorities often request interviews and witness statements, those requests can often be met under US law by obtaining certified business records.

Please note that all the materials must be accompanied by a witness statement from the custodian of records as described on pages 11-12 of the original request in order to be admissible in the UK.

Execution of request

Please provide this office with the name and telephone number of the Assistant United States Attorney to whom this request is assigned. That AUSA should analyze the request and notify us immediately if it contains insufficient information to permit execution. Otherwise, the AUSA should be commissioned pursuant to 18 U.S.C. § 3512 to execute this request on behalf of the United Kingdom. Sample pleadings and guidance relating to the execution of foreign assistance requests are available and may be downloaded from OIA Online, which may be accessed through USANet, or you may contact the assigned paralegal specialist, Christine Quinn, for assistance.

I will serve as the main point of contact for both your office and the United Kingdom. In my absence, please contact OIA Associate Director Lystra Blake by email at Lystra.Blake@usdoj.gov or by telephone at (202) 514-0010 if you have any questions regarding the execution of the request or need further information from the UK authorities. You may also contact Christine Quinn, paralegal, by telephone at (202) 307-1169 or by email at Christine.Quinn@usdoj.gov.

Please keep this office apprised of the status of this request. Both OIA and law enforcement authorities in the United Kingdom appreciate your assistance in this international criminal matter and thank you.

Sincerely,

/s/

Amy Jeffress
Dept. of Justice Attaché
American Embassy - London



# Home Office

**Judicial Co-operation Unit**
United Kingdom Central Authority
5th Floor, Fry Building, 2 Marsham Street, London SW1P 4DF
Switchboard 020 7035 4848 Fax 0207 035 6985
Direct No.0207 035 6534
http://www..homeoffice.gov.uk/police/mutual-legal-assistance

US Department of Justice
Office of International Affairs
Criminal Division
1301 New York Avenue,
WASHINGTON DC 20005

Our Ref:    MLO2011USA7271231

Your Ref:

Date:    20th September 2011

## URGENT

Dear Sir/Madam

## LETTER OF REQUEST FOR LEGAL ASSISTANCE IN THE MATTER OF OPERATION LUMPFISH

Please find enclosed a letter of request for legal assistance issued by the Crown Prosecution Service dated 8th February 2010. **I should be grateful if you would arrange for the request to be forwarded to the Office of International Affairs to be dealt with.**

It would assist if you could indicate when sending the evidence to us, whether it should be returned to you when no longer required for the purposes specified in the request.

I am the designated caseworker in this case so please send any evidence to me at the address set out above. **Please quote the UKCA reference in all future correspondence in this matter.**

In the event that the evidence is handed to visiting officers, please let me know so I can update our file.

I would be grateful if you would acknowledge receipt of this request.

Thank you for your assistance in this matter and I look forward to hearing from you in due course.

Yours faithfully

Tracey Carter
*For and on behalf of the Secretary of State*

RECEIVED
OFFICE OF
INTERNATIONAL AFFAIRS

2011 AUG -4 AM 7: 53

CRIMINAL DIVISION



# Home Office

**Judicial Co-operation Unit**
United Kingdom Central Authority
5th Floor, Fry Building, 2 Marsham Street, London SW1P 4DF
Switchboard 020 7035 4848 Fax 0207 035 6985
Direct No.0207 035 6534
http://www..homeoffice.gov.uk/police/mutual-legal-assistance

US Department of Justice
Office of International Affairs
Criminal Division
1301 New York Avenue,
WASHINGTON DC 20005

Our Ref:    MLO2011USA7271231

Your Ref:

Date:    1st August 2011

## URGENT

Dear Sir/Madam

## LETTER OF REQUEST FOR LEGAL ASSISTANCE IN THE MATTER OF OPERATION LUMPFISH – SIOBHAN CLARKE & OTHERS

Please find enclosed a letter of request for legal assistance issued by the Crown Prosecution Service dated 22nd July 2011. I should be grateful if you would arrange for the requests to be executed.

It would assist if you could indicate when sending the evidence to us, whether it should be returned to you when no longer required for the purposes specified in the request.

I am the designated caseworker in this case so please send any evidence to me at the address set out above. **Please quote the UKCA reference in all future correspondence in this matter.**

In the event that the evidence is handed to visiting officers, please let me know so I can update our file.

I would be grateful if you would acknowledge receipt of this request.

Thank you for your assistance in this matter and I look forward to hearing from you in due course.

Yours faithfully

Tracey, Carter
*For and on behalf of the Secretary of State*

Sue Patten - Head of Central Fraud Group
Crown Prosecution Service
6th Floor South Rose Court,
2 Southwark Bridge
London SE1 9HS

Fax: +44 (0) 20 3357 0237
E-mail: sue.patten@cps.gsi.gov.uk



**The CPS incorporates RCPO**

US Department of Justice
Criminal Division
Office of International Affairs       *Your ref:*   182-33345
1301 New York Avenue, NW
Washington, DC 20005
USA                                   *Our ref:*   01GB0120509

Case Lawyer: Rakesh Somaia
Tel: +44 (0) 20 3357 1900
Fax: +44 (0) 20 3357 0381
E-mail: rakesh.somaia@cps.gsi.gov.uk

Date: 22 July 2011.

Dear Sir or Madam

**<u>URGENT SUPPLEMENTARY LETTER OF REQUEST</u>:**
**Operation Lumpfish – Siobhan Clarke & others**

I am Sue Patten, a Crown Prosecutor and Head of the Central Fraud Group of the Crown Prosecution Service of England and Wales, a designated prosecuting authority. I am empowered to make this request pursuant to section 7 of the Crime (International Co-operation) Act 2003.

I write further to a Letter of Request of 8 February 2010 in order to request your additional assistance in connection with the criminal prosecution as outlined therein. May I thank you for the valued assistance that has been afforded in the execution of my earlier Letter of Request. I draw your attention to the information contained within

that Letter of Request, which I rely upon for the purposes of this supplementary request.

Siobhan Clarke, Craig Anderson, Sheahan Steele, Rajan Aheer, Sandeep Aheer, James Batchelor, Mathew Clarke, Leon Miles, Denver White, Arron Jassi, Colton Johnson and Lamar Johnson were charged with Conspiracy to defraud in August 2010. Craig Anderson, Arron Jassi and Lamar Johnson have pleaded guilty and were sentenced to as follows

Craig Anderson:  4 years 8 months imprisonment
Lamar Johnson:  8 months imprisonment
Arron Jassi :  8 months imprisonment (suspended for 2 years).

The remaining defendants are due to stand trial in January 2012. **A pre-trial hearing is due to take place on 31 October 2011 and it would be appreciated if the assistance requested within this supplemental letter of request could be completed in time for this hearing.  In the event that this is not possible, the assistance requested would still be needed.**

This fraud was discovered by Apple iTunes and Tunecore.Com and was subsequently reported to US Law Enforcement by Apple Security in early 2009. An investigation was started by Assistant District Attorney Steven Kramer of the Money Laundering and Revenue Crimes Bureau of Kings County New York. At the beginning of February 2009, it became apparent that the suspects identified in the investigation were all resident in the UK and the investigation was taken on by DC Simon Mills of the UK Metropolitan Police E-Crime Unit.  ADA Kramer has been of great assistance to the UK investigation.

<u>Basis of the Supplementary Request</u>

The Instrument as Contemplated by Article 3(2) of the Agreement on Mutual Legal Assistance Between the United States of America and the European Union Signed 25 June 2003, as to the Application of the Treaty Between the Government of the United Kingdom of Great Britain and Northern Ireland and the Government of the United States of America on Mutual Legal Assistance in Criminal Matters Signed 6 January 1994.

<u>How this Further Request Arises</u>

The facts of the case are set out in my earlier Letter of Request.

Additional information giving rise to this request for further assistance is as follows:

The defendant James BATCHELOR has an account with CD Baby reference: CDB00029670 which between June 2008 and January 2009 generated royalty payments of £180,000 from fraudulent online sales. Before the fraud started the account generated approximately $70 per year.

The defendant Sheahan STEELE has an account with Songcast which was opened on 10th March 2008 and which between June 2008 and January 2009 generated royalty payments of $32,564 from fraudulent online sales.

Further Assistance Requested

1. That the investigating officer DC Simon Mills of the Metropolitan Police E-Crime Unit be permitted to travel to the United States to assist whilst written statements are taken from an authorised employee of the following companies:

   **a) CD Baby 5925 NE 80 Avenue, Portland, Oregon 97218-2891**

The written statement should include the following information:

   i.    Details of all the accounts held by BATCHELOR
   ii.   Account opening information
   iii.  Transaction history from the start of each account to date
   iv.   Details of any payments made
   v.    Details of any dealings with any defendant in this matter.
   vi.   Details of payment instructions
   vii.  Copies of email traffic between BATCHELOR and CD Baby

The CD Baby account records relating to BATCHELOR are sought to provide evidence of his knowing involvement in the conspiracy to defraud Apple, iTunes and Amazon.Com by showing the receipt of royalty payments from the fraud and the fact that BATCHELOR then laundered payments from CD Baby through the accounts of the defendants Sandeep AHEER, Matthew CLARKE and Leon MILES.

Informal contact has been made with Christine Barnum, a Controller at CD Baby. She has indicated that CD Baby are willing to provide the information requested and provide a statement to the UK police in relation to BATCHELOR'S account but has indicated that a subpoena will be required

before this information can be provided.

**b) Songcast 2926 State Rd, Suite 111 Cuyahoga Falls, Ohio  44223**

The written statement should include the following information:

   i.    Details of all the accounts held by STEELE

   ii.   Account opening information

   iii.  Transaction history from the start of each account to date

   iv.  Details of any payments made

   v.   Details of any dealings with any defendant in this matter.

   vi.  Details of payment instructions

   vii.  Copies of email traffic between STEELE and Songcast

The Songcast account records relating to STEELE are sought to provide evidence of his knowing involvement in the conspiracy to defraud Apple iTunes and Amazon.Com by showing the receipt of royalty payments from the fraud and the subsequent laundering of them from Songcast to the accounts of the defendant Siobhan CLARKE.

Informal contact has been made with Mike Wright at Songcast. He has indicated that Songcast are willing to provide the information requested and provide a statement to the UK police in relation to STEELE'S account.

Permission is sought for the officer to attend due to the technical nature of some of the evidence sought.  The officer has extensive knowledge of the case and will be able to ensure the information being provided is exactly what is needed to prove the elements of each fraud. He has already made contact with the relevant people at CD Baby and Songcast. He has previously attended the US when similar enquiries were made earlier in the investigation.

2.  That such other enquiries be made, persons interviewed and evidence secured as appears to you to be necessary in the course of executing this request

3.  I additionally request that any requisite court order or other order necessary to enable the provision of the above requested assistance be sought.

Unless you indicate otherwise, any evidence obtained pursuant to this request may be used in any other judicial proceedings arising from this prosecution, including any restraint or confiscation proceedings, whether relating to the above named subject(s) or to any other person who may be joined as a co-defendant.

Transmission of Evidence

Please send any evidence to the United Kingdom Central Authority (UKCA) and advise the UKCA if you wish to have any part of the evidence returned to you at the conclusion of the proceedings in the United Kingdom.

When you send the evidence, I would be grateful if you would also email lettersofrequest@cps.gsi.gov.uk to confirm that the evidence has been dispatched. This will enable enquiries to be made to locate the evidence if it is not received within a few days.

Reciprocity

I confirm that the assistance requested above may be obtained under current English law if in a like case a request for such assistance were made to the authorities in England and Wales.

Contacts

The appropriate person to contact in the event of any query about this request is the Prosecutor whose details are listed below:

Rakesh Somaia
Central Fraud Group
6th Floor, Rose Court,
2, Southwark Bridge Road,
London SE1 9HS
Telephone: +44 (0) 20 3357 1900
Facsimile:   +44 (0) 20 3357 0381
Email: rakesh.somaia@cps.gsi.gov.uk


The Investigator's contact details are:


Detective Constable Simon Mills
E-Crime Unit
Metropolitan Police,
1st Floor Indigo Block
Cobalt Square
South Lambeth Road

London
SW8 1SU
Telephone: +44 (0) 20 7230 8611
Facsimile:   +44 (0) 20 7230 8192
Email: simon.a.mills@met.pnn.police.uk

I extend my thanks in anticipation of your valued co-operation and assistance in this matter.

Yours faithfully,

**Sue Patten,**
**Head of Central Fraud Group**



**CPS**

The CPS incorporates RCPO

The competent Judicial Authorities
United States of America.

**F.A.O:**
**Steven Kramer**
**Assistant District Attorney**
**Money Laundering & Revenue Crimes Bureau**
**District Attorney of Kings County NY**
**350 Jay Street, 17th Floor**
**Brooklyn, NY 11201**

8th February 2010

**Our ref:  DL/pm**

Dear Sirs,

**<u>LETTER OF REGATORY</u>**

I have the honour to request your assistance pursuant to the United Nations
Convention in Fraud & Money Laundering in obtaining certain information, statements
and documents in relation to a criminal investigation being conducted by officers of the
Metropolitan Police, Police Central e-Crime Unit, in London.

The Prosecution of Offences Act 1985 states that the Director of Public Prosecutions
has the duty to take over the conduct of criminal proceedings (other than certain
proceedings relating to relatively minor offences) instituted on behalf of a Police Force.
The Director is the Head of the Crown Prosecution Service.  As a Crown Prosecutor
designated by him I have his powers to conduct the proceedings in this case and I am
empowered to issue this letter.

Officers of the Metropolitan Police Service E crime Unit are investigating suspected
offences of Fraud by misrepresentation and Money Laundering.

1.    **Name:**            **Siobhan Louise Clarke**
      Address:        21 Edwin Road, Dartford, Kent, DA2 7DD
      Nationality:     British
      Date of Birth:   21/04/1987

2. **Name:** Craig Anthony Anderson
   **Address:** 21 Edwin Road, Dartford, Kent, DA2 7DD
   **Nationality:** British
   **Date of Birth:** 14/05/1987

3. **Name:** Terry George Foster
   **Address:** 44 Greenfield Road, Great Barr, Birmingham, B43 5AP
   **Nationality:** British

   **Date of Birth:** 17/03/1975

4. **Name:** Marie Mills
   **Address:** 103 Great Hampton Row, Hockley, Birmingham, B19 3AY
   **Nationality:** British

   **Date of Birth:** 11/01/1973

5. **Name:** Sheahan Mark Steele
   **Address:** 7 Oakfield Walk, Aston, Birmingham, B6 6HB
   **Nationality:** British

   **Date of Birth:** 01/11/1968

6. **Name:** Rajan Aheer
   **Address:** 91 Wellington Road, Wolverhampton, WV14 6BQ
   **Nationality:** British

   **Date of Birth:** 09/10/1989

7. **Name:** Sandeep Aheer
   **Address:** 91 Wellington Road, Wolverhampton, WV14 6BQ
   **Nationality:** British

   **Date of Birth:** 07/09/1987

8. **Name:** James Oswald Batchelor
   **Address:** 100 Stone hill Road, Derby, DE23 6TL
   **Nationality:** British

   **Date of Birth:** 15/10/1982

9.  **Name:**           **Matthew Clarke**
    Address:        60 Cross Farm Road, Birmingham, B17 0ND
    Nationality:    British

    Date of Birth:  13/04/1979


10. **Name:**           **Leon Miles**
    Address:        26  Brooklands  Parade,  East  Field,  Wolverhampton,
                    WV1 2NE
    Nationality:    British

    Date of Birth:  05/09/1990


11. **Name:**           **Denver Harrison White**
    Address:        42 Helming Drive Wolverhampton, WV1 2AL
    Nationality:    British

    Date of Birth:  07/09/1987


12. **Name:**           **Arron Jassi**
    Address:        12, Denmore Gardens Wolverhampton, WV1 2BW
    Nationality:    British

    Date of Birth:  05/11/1989


13. **Name:**           **Colton James Johnson**
    Address:        47 Deansfield Road, Wolverhampton, WV1 2JU
    Nationality:    British

    Date of Birth:  25/11/1990


14. **Name:**           **Lamar Ricardo Nathaniel Johnson**
    Address:        161, Stowheath Lane, Wolverhampton, WV1 2QL
    Nationality:    British

    Date of Birth:  02/08/1991


**The purposes of this request are-**

1.  To obtain financial and other evidence which will be of substantial benefit to the
    investigation and in any criminal prosecution that follows in England and Wales,
    such evidence being in the form of witness statements (together with copies of e
    mails, financial records and other documentation) from internet music providers,
    facilitation companies, software providers and other identified victims of the
    fraud.

2.    To obtain the financial information in relating to the losses incurred by Amazon.Com and Apple iTunes as a result of the fraud and details of the tracks/albums/artists identified as being the vehicles for the fraud.

3.    To obtain the financial information from Tunecore.Com and Audio and Video Labs (CD BABY) identifying the tracks and albums they sold and details of all the transfers of royalties in respect of the sales of the tracks and albums to the destination accounts identified as being controlled by those identified as being involved in the fraud or money laundering.

Fraud by misrepresentation is an offence under Section 2 of the Fraud Act 2006, and section 327 & 328 of the Proceeds of Crime Act 2002.

### Section 2 States:

2(1) a person is in breach of this section if he:-

  (a) dishonestly makes a false representation, and

  (b) intends, by making the representation:-

      (i)     to make a gain for himself or another, or

      (ii)    to cause loss to another or to expose another to a risk of loss.

2(2) a representation is false if:-

  (a)    it is untrue or misleading, and

  (b)    the person making it knows that it is, or might be, untrue or misleading.

The maximum penalty under section 2 of the Fraud Act 2006 is ten years imprisonment.

Under Sections 327 and 328 of the Proceeds of Crime Act 2002 there are a number of different offences of Money Laundering under English law.

### Section 327 states:

327(1) a person commits an offence if he:-

      (a)    conceals criminal property;
      (b)    disguises criminal property;
      (c)    converts criminal property;
      (d)    transfers criminal property;
      (e)    removes criminal property from England and Wales or from Scotland or Northern Ireland

**328(1) states:**

A person commits an offence if he enters into or becomes concerned in an arrangement which he knows or suspects facilitates (by whatever means) the acquisition, retention, use or control of criminal property by or on behalf of another person.

The maximum penalty under section's 327 & 328 of the Proceeds of Crime Act 2002 is fourteen years imprisonment.

**Confiscation**

In the event of a conviction for the above offences the Crown Court will consider confiscation of assets.

If the conviction is for the offences under section 327 Proceeds of Crime Act 2002 (hereafter referred to as POCA) this is known as a lifestyle offence. In the event of a conviction for a lifestyle offence the court is entitled to consider whether or not a defendant has a criminal lifestyle; if the court so determines then it can make certain assumptions as to income and assets.

Likewise if the subjects are convicted of 4 or more of the above offences then again this is known as a lifestyle offence under Schedule 2 of POCA.

The four assumptions are:-

1.  all property transferred to the defendant in a period beginning from 6 years prior to when the proceedings were started against him was obtained by him as a result of his general criminal conduct;

2.  all property held by the defendant at any time after the date of his conviction was obtained by him as a result of his general criminal conduct;

3.  all expenditure incurred by the Defendant over that same period (beginning from 6 years prior to when the proceedings were started against him) was met from property obtained by him as a result of his general criminal conduct; and

4.  any property obtained by the defendant is free of any other interests in it for the purposes of valuing any property obtained or assumed to have been obtained.

Once the Crown Court has decided the amount of benefit from general criminal conduct (using the assumptions above), it must decide the recoverable amount and make a confiscation order requiring the defendant to pay that amount.

The recoverable amount is the amount of benefit from general criminal conduct unless the defendant shows that the available amount is less than the recoverable amount.

The available amount is the total value of the defendant's free property together with the value of any "tainted gifts".

Free property is widely defined. It includes any property in which the defendant holds an interest (interest includes right).

A defendant is to be treated as making a gift if he transfers property to another person for a value, which is significantly less than the value of the property at the time of the transfer.

A gift is tainted if it was made at any time in a period beginning from 6 years prior to when the proceedings were started against the defendant. Alternatively, a gift is tainted if it was made at any time if it can be shown to be either property obtained as a result of, or in connection with his general criminal conduct or property that (wholly or partly and directly or indirectly) represents property obtained as a result of, or in connection with his general criminal conduct.

The values of legitimately acquired assets are calculated as part of the available amount. There is no requirement on the prosecution to prove that the defendant's assets are acquired from criminal conduct.

The Crown Court, in coming to its decision, must take account of any property held by the defendant wherever it is situated in the world.

If the defendant satisfies the Crown Court that the available amount is less than his benefit from general criminal conduct, the Crown Court must make a Confiscation Order in the available amount.

### SUMMARY OF FACTS

The Police Central E-Crime unit has been established in order to identify, target and prosecute persons involved in internet crime. These types of crimes include Phishing scams, Pharming scams and advanced fee frauds, also know as 419 scams and other computer related deceptions.

In January 2009 the District Attorney's office from Kings County in New York contacted the PCeU. The department concerned specialising in money laundering and revenue crime

They in turn had received a complaint from the Apple Corporation and Amazon.Com. They had made an allegation of internet-enabled fraud.

The nature of the fraud is that a male calling himself Daniel Thomas, had contacted Tunecore.Com, (this being an online music management company which is a middleman between the artist and companies that conduct online sales of music tracks) and said that he had a number of music tracks and albums that he wished to sell.

Enquiries identified that a UK national, Craig Anderson paid Tunecore.Com for the upload of the music. The music tracks then went on sale in April 2008 with very minimal sales.

Between April 2008 and January 2009, the albums and tracks were purchased approximately 300,000 times. The sales of these tracks generated about $750,000.

They were purchased using up to 1500 compromised US and UK credit cards. This offence came to notice because sales figures were comparable to a major recording artist. Apple Corporation began an investigation, which in turn identified the fraud.

Each sale of a track generated a royalty payment to the artist concerned. iTunes and Amazon paid the royalty to Tunecore.Com, who in turn paid the artist. By the time the fraud had been discovered, royalty payments of $300,000 had been paid.

**Daniel Thomas**, nominated a number of PayPal accounts which, were to receive the money. As a result, a number of payments were made to these accounts.

Enquiries made with PayPal, identified the account holders concerned. The account holders were all UK nationals.

Enquiries also identified **Denver White** as the DJ who created some of the music track. Daniel Thomas later identified himself as Denver White to Tunecore.Com in email communication.

A request was submitted to PayPal for them to identify, which UK bank accounts the money went too once it had left their respective PayPal accounts. The majority of the royalties went to a bank account controlled by **Siobhan Clarke**. Other accounts that also received royalties belonged to: **Steele, Mills, Foster and Rajan Aheer.**

UK court production orders were obtained in respect of the UK bank accounts identified by PayPal.

On the 10th June 2009, warrants were executed at addresses in London, Birmingham and Wolverhampton. Nine people were arrested.

Two individuals arrested were **Siobhan Clarke** and a **Rajan Aheer**. In the case of Siobhan Clarke, during the six month period. Her account received over £100,000.00 from Tunecore, (the majority of the royalties). The monies being taken out in cash sums.

The bank accounts for both Siobhan Clarke and Rajan Aheer were examined. It could be seen that both accounts had received large deposits from **Sandeep Aheer, (brother of Rajan Aheer).**

A production order was obtained for the bank account controlled by Sandeep Aheer. It was noted that Aheer's account had received nearly £92,000.00 from one account: that account belonging to a male called James Batchelor.

Copies of the bank statements for **James Batchelor** were obtained. They showed that one of his bank accounts received nearly £200,000.00. The monies coming from an Internet based company called Audio & Video Labs, who up to October 2008 were trading as CD Baby. The company concerned being similar to Tunecore.Com.

Enquiries have identified that this money is also royalties from the sale of music tracks and albums, again bought using compromised credit cards.

From Batchelor's account, it was noted that the monies transferred into his account, were transferred into bank accounts belonging to Sandeep Aheer, and two other individuals, **Leon Miles and Matthew Clarke**. The money was then taken out from these personal accounts, normally the same day the money went in.

These individuals identified below have been arrested and interviewed under caution.

(i) **Siobhan Clarke:** Tunecore paid royalty payments from the sale of music tracks and albums into her PayPal account, in excess of $200,000.00. The money was then transferred from her PayPal account into her UK Lloyds account. The music being purchased using compromised credit cards. As yet the money has not been located.

(ii) **Sheahan Steele:** His PayPal account was also in receipt of royalty payments from Tunecore.Com as a result of the sale of music using compromised credit cards. The money being transferred from his PayPal account to his UK Lloyds account.

(iii) **Marie Mills:** Again her PayPal account received royalty payments from Tunecore.Com which were then paid into her UK bank account.

(iv) **Terry Foster:** His PayPal account received royalty payments from Tunecore.Com which were then paid into his UK bank account.

(v) **Rajan Aheer:** received Royalty payments from Tunecore Com which were then paid into his UK bank account.

(vi) **James Batchelor:** has received royalty payments from CD & Video Labs as a result of the sale of music using compromised credit cards. The money immediately being transferred to Sandeep Aheer, Leon Miles and Mathew Clarke's personal accounts.

(vii) **Matthew Clarke:** Received payments from James Batchelor.

(viii) **Leon Miles:** Received payments from James Batchelor.

(ix) **Sandeep Aheer:** is the brother of Rajan Aheer. He received payments from James Batchelor.

(x) **Denver White:** is the DJ who called himself: Daniel Thomas. It was he who created the tracks and albums that were made available for sale via Tunecore.Com, and then onto iTunes and Amazon for sale to the general public, or in this case to be purchased using compromised credit cards.

(xi) **Craig Anderson:** appears to be the main coordinator in respect of this fraud. Enquiries have identified that Anderson purchased 24 Sony Vaio

laptops. The laptops were provided to individuals in order to facilitate the purchase of the tracks and albums. The laptops were also supplied with software already installed called: Hide-My-IP which Anderson had purchased.

**(xii) Colton Johnson:** is the cousin of Anderson and fingerprint evidence implicates him in the distribution of the laptops to Jassi and Lamar Johnson. Johnson purchased three hard disk duplicators to facilitate the fraudulent purchases of music albums.

**(xiii) Arron Jassi:** found in possession of one of the laptop computers used to make fraudulent purchases from iTunes and Amazon.

**(xiv) Lamar Johnson:** found in possession of one of the laptop computers used to make fraudulent purchases from iTunes and Amazon.

Having supplied the laptops, Anderson then emailed the individuals concerned, lists of compromised credit cards. He also paid Tunecore.Com to set up the account used by White/Thomas, to upload the tracks.

He was also instrumental in creating a company called Niche records which acquired music tracks and albums from artists to sell on iTunes and Amazon.Com as part of the fraud.

## ENQUIRES TO BE MADE

It is requested that the competent judicial authorities provide assistance in connection with the criminal investigation that is being carried out by the Metropolitan Police by causing evidence to be provided by the following sources.

1. To meet with Assistant District Attorney, Mr. Steven Kramer and take a statement from him detailing the enquiries he has conducted and evidence he has obtained.

2. With his assistance, obtain witness statements and associated documentary evidence, which will include account opening documentation financial information, as well as all documentary exhibits from the following individuals who represent their associated companies:

**Dan ERLEWINE**
Apple Inc
1 Infinite Loop
Cupertino
CA 95014

**Jana LIPSCOMB**
Amazon. Com
705 5th Avenue S
Suite 220 Seattle
WA 98104

**Scott HALL**
My Privacy Tools Inc (HideMyIP)
132 North Camino Real Suite
415 Encinitas CA
92024-2801

**Jeff PRICE**
Tunecore.Com
55 Washington
Suite 822
Brooklyn NY 11201

**Christine BARNUM**
CD Baby
5925 NE 80 Avenue
Portland
Oregon
97218-2891

In addition to the statement, to assist in obtaining all documents, both financial and other, and exhibit all evidence, which will include financial records, showing the transfer of funds from iTunes and Amazon.Com to Tunecore.Com and CD Baby. From Tunecore.Com and CD Baby to the respective PayPal accounts of the suspects identified. Account opening documents and any other documentary evidence that supports a prosecution in the United Kingdom.

This would include records of email communication, details of IP addresses and the subsequent records showing the usage relating to the linked IP addresses.

3. With the assistance of Assistant District Attorney Kramer, identify and obtain victim statements from the owners of the compromised credit cards, along with copies of their financial records, which identify the fraudulent transactions.

In respect of victims being identified, each case the written statement should deal with the following matters in respect of account referred to:-

(a) when she/he first noticed any unusual activity, in relation to their account;

(b) the amount of money taken from the account;

(c) details of any documents, files, accounts or other records used in the transfer of the money;

(d) exhibit copies of all relevant documents including:-

    (i) bank statements;

    (ii) documents attributable to the account; or

(iii)   documents held by the bank on behalf of the account holder which would be beneficial to the United Kingdom authorities in assessing the amount involved and any subsequent compensation issues. Copies of the documents should be supplied in a form in which they can be easily and clearly examined and copied.

4.  Copies of contracts, and any other documentation created in the opening of the accounts with either of the companies, Tunecore.Com and Audio & Visual Labs, (CD Baby).

5.  Copies of financial records from both iTunes and Amazon showing the sales of the music tracks, monies made and monies lost.

## ASSISTANCE REQUIRED

1.  It is requested that Detective Constable Simon Mills and Detective Constable Michael Campbell of the Metropolitan Police E-Crime Unit, 1st Floor Indigo Block, Cobalt Square. South Lambeth Road, London SW8 1SU (Tel: +44 207 230 8083. Fax +44 207 230 8096. Email Simon.Mills@met.police.uk) are permitted to be present when the enquiries be made.

2.  It is requested that the witness statement(s) be taken in writing, dated and headed by the following declaration: "*This statement consisting of ___ pages is true to the best of my knowledge and belief*". The number of pages should be filled in the space once the statement has been written and the witness should sign the statement beside the declaration, on every page and at the end. Please date the statement. It is requested that the witness' address, telephone number and date of birth be written on the back of the first page of the statement.

3.  That an indication be obtained of the preparedness of any witness to travel to England to give evidence in   person.

4.  That such other enquiries are made, persons interviewed and exhibits secured as appears to be necessary in the course of the investigation.

5.  That an indication be obtained of the preparedness of any witness to travel to England to give evidence in person

6.  That originals, or signed and certified copies of the originals, of any statements made and any documents or other items secured during the course   of   the enquiries be handed to Simon Mills and Patrick Campbell permission given for their removal to England for use at the trial

7.  Should any of the information sought be produced from computer records is requested that statement be signed by a person who has responsibility for the operation and running of the computer saying:

a)   that there are no reasonable grounds for believing that the statement is inaccurate because of improper use of the computer.

b)   that at all material times the computer was operating properly, or if not, that any respect in which it was not operating properly or was out of operation was not such as to affect the production of the document or the accuracy of it contents.

8.   Should any of he information sought b contained within a business record of which the witness making the statement had no first hand knowledge is requested that a declaration is signed by the witness saying.

a)   The document was created or received by a person in the course of a   trade, business, profession or other occupation or as the holder of a   paid or unpaid office.

And

b)   The information contained in the doc unmet was supplied by a person who had or may reasonable be supposed to have had [personal knowledge of the matters dealt with.

9.   That such other enquiries are made, persons interviewed and exhibits seized as appear to be necessary in the course of the investigation.

I thank you in advance for the valuable co-operation concerning this case.

Yours faithfully,

**David Levy.**
**Unit Head**
**CPS Fraud Prosecution Division**

7 of 100 DOCUMENTS

U.S. Treaties on LEXIS

UNITED KINGDOM

TREATY WITH THE UNITED KINGDOM ON MUTUAL LEGAL ASSISTANCE ON
CRIMINAL MATTERS

TREATY DOC. 104-2

*1994 U.S.T. LEXIS 205*

January 6, 1994, Date-Signed

**STATUS:**
 [*1]  PENDING: January 23, 1995. Treaty was read the first time and, together with the accompanying papers, referred
to the Committee on Foreign Relations and ordered to be printed for the use of the Senate

MESSAGE FROM THE PRESIDENT OF THE UNITED STATES

TRANSMITTING THE TREATY BETWEEN THE GOVERNMENT OF THE UNITED
STATES OF AMERICA AND THE GOVERNMENT OF THE UNITED KINGDOM OF
GREAT BRITAIN AND NORTHERN IRELAND ON MUTUAL LEGAL ASSIS-
TANCE IN CRIMINAL MATTERS, SIGNED AT WASHINGTON ON JANUARY 6,
1994, TOGETHER WITH A RELATED EXCHANGE OF NOTES SIGNED THE
SAME DATE

**TEXT:**
104TH CONGRESS

SENATE

**LETTER OF TRANSMITTAL**

THE WHITE HOUSE, *January 23, 1995.*
*To the Senate of the United States:*

With a view to receiving the advice and consent of the Senate to ratification, I transmit herewith the Treaty Be-
tween the Government of the United States of America and the Government of the United Kingdom of Great Britain
and Northern Ireland on Mutual Legal Assistance in Criminal Matters, signed at Washington on January 6, 1994, with a
related exchange of notes signed the same date. Also transmitted for the information of the Senate is the report of the
Department of State with respect to this Treaty.

The Treaty [*2]  is one of a series of modern mutual legal assistance treaties being negotiated by the United States
in order to counter criminal activities more effectively. The Treaty should be an effective tool to assist in the prosecu-
tion of a wide variety of modern criminals, including members of drug cartels, "white-collar criminals," and terrorists.
The Treaty is self-executing.

The Treaty provides for as broad range of cooperation in criminal matters. Mutual assistance available under the
Treaty includes: (1) the taking of testimony or statements of witnesses; (2) the provision of documents, records, and
evidence; (3) the service of legal documents; (4) the location or identification of persons; (5) the execution of requests
for searches and seizures; and (6) the provision of assistance in proceedings relating to the forfeiture of the proceeds of
crime and the collection of fines imposed as a sentence in a criminal prosecution.

I recommend that the Senate give early and favorable consideration to the Treaty, and related exchange of notes,
and give its advice and consent to ratification.

interpretative notes accompanying the Treaty, the limitation based on "important public policy" grounds would include

WILLIAM J. CLINTON.

**LETTER OF SUBMITTAL**

DEPARTMENT OF STATE,

*Washington, January 6, 1995.*
THE PRESIDENT,
  [*3] *The White House.*

THE PRESIDENT: I have the honor to submit to you the Treaty between the Government of the United States of America and the Government of the United Kingdom of Great Britain and Northern Ireland on Mutual Legal Assistance in Criminal Matters (the "Treaty"), signed at Washington on January 6, 1994, together with a related exchange of notes signed on the same date. I recommend that the Treaty and the related exchange of notes be transmitted to the Senate for its advice and consent to ratification.

The Treaty covers mutual legal assistance in criminal matters. In recent years, similar bilateral treaties have entered into force with Argentina, the Bahamas, Canada, Italy, Mexico, Morocco, the Netherlands, Spain, Switzerland, Thailand, Turkey, the United Kingdom concerning the Cayman Islands, and Uruguay. Other similar treaties have been signed and ratified by the United States (but have not yet entered into force) with Belgium, Colombia, and Jamaica. In addition, treaties with Nigeria and Panama have been transmitted to the Senate and await Senate consideration. This Treaty contains many provisions similar to those in the other treaties.

This Treaty will enhance our  [*4]  ability to investigate and prosecute drug-related money laundering offenses. It is designed to be self-executing and will not require implementing legislation.

Article 1 provides for mutual assistance in "proceedings", which is defined in Article 19 to include any measure taken in connection with the investigation or prosecution of criminal offenses, including the freezing, seizure, and forfeiture of proceeds and instrumentalities of crime and the imposition of fines related to a criminal prosecution.

The Treaty does not contain a provision limiting assistance to offenses which are proscribed under the law of the Party from whom assistance is requested (the "Requested Party"). As clarified in the interpretative notes that accompany the Treaty, however, the Treaty does not apply to anti-trust or competition investigation or proceedings underway at the time the Treaty was signed. This exchange of notes also provides that the Central Authorities of the Parties may, at a later date, provide assistance in such proceedings as may be agreed in writing between the Parties.

Article 1 further provides that assistance under the Treaty shall include: taking the testimony or statements or persons;  [*5]  providing documents, records, and evidence; serving documents; locating or identifying persons; transferring persons in custody for testimony or other purposes; executing requests for searches and seizures; identifying, tracing, freezing, seizing, and forfeiting the proceeds and instrumentalities of crime and assistance in related proceedings; and such other assistance as may be agreed between the Central authorities.

Article 1 explicitly states that the Treaty does not create rights in private parties to obtain, suppress, or exclude evidence, or to impede the execution of a request.

Article 2 provides for the establishment of Central Authorities and defines the Central Authorities for purposes of the Treaty. For the United States, the Central Authority is the Attorney General or a person designated by the Attorney General. For the United Kingdom, the Central Authority is the Secretary of State for the Home Department or the Secretary's designee. The article provides that requests under the Treaty shall be made directly between the Central Authorities.

Article 3 sets forth the circumstances under which a Party may deny assistance under the Treaty, including requests related to certain  [*6]  military offenses, offenses of a political character, and requests relating to an offender who, if proceeded against in the Requested Party, would be entitled to be discharged on grounds of a previous acquittal or conviction. In addition, a Requested Party may also refuse assistance, if, in its view, the request, if granted, would impair its sovereignty, security, or other essential interests or would be contrary to important public policy. As clarified in the interpretative notes accompanying the Treaty, the limitation based on "important public policy" grounds would include a Requested Party's policy of opposing the exercise of jurisdiction which, in its view, is extraterritorial and objectionable.

Before denying assistance, the Central Authority of the Requested State is required to consult with its counterpart in the Requesting State to consider whether assistance can be given subject to such conditions it deems necessary. If the Requesting State accepts assistance subject to conditions, it shall comply with the conditions.

Article 4 prescribes the form and content of written requests under the Treaty, specifying in detail the information required in each case. The article specifies [*7] further information to be provided to the extent necessary and possible to assist in locating individuals and effecting particular types of assistance.

Article 5 provides that a Request Party shall take whatever steps it deems necessary to give effect to requests from the other Party. Courts in the Requested State are empowered to issue subpoenas, search warrants, or other order orders necessary to execute such requests.

Article 5 further states that requests be executed in accordance with the laws of the Requested State unless the Treaty provides otherwise. The method of execution specified in the request is to be followed to the extent that it is not incompatible with the laws and practices of the Requested Party. If the Central Authority of the Requested Party determines that execution of the request would interfere with ongoing proceedings or prejudice the safety of any person in its territory, it may postpone execution or, after consultations with the Requesting Party, impose conditions on such execution. If the Requesting Party accepts assistance subject to such conditions, it shall comply with them.

Under Article 5, the Central Authority of the Requested Party shall promptly [*8] inform its counterpart in the Requesting Party of the outcome of the execution of a request. If a request is denied, a Central Authority shall inform its counterpart of the reasons for such denial.

Article 6 apportions between the two States the costs incurred in executing a request. Generally, each State shall bear the expenses incurred within its territory of executing a request.

Article 7 establishes procedures both for ensuring the confidentiality of requests and their contents. Upon request, the Requested Party shall keep confidential any information that might indicate that a request has been made or responded to. However, if a request cannot be executed without breaching confidentiality, the Requested State must inform the Requesting State, so that the Requesting State may determine whether to withdraw the request in order to maintain confidentiality. Article 7 further obliges the Requesting Party not to use or disclose any information or evidence obtained under the treaty for purposes unrelated to the proceedings stated in the request without the prior consent of the Requested Party. In the interpretative notes, the Parties recognize that these prohibitions will not prohibit [*9] a Requesting Party from disclosing such information to the extent there is an obligation to do so under that Party's Constitution or law. This last clarification was provided to ensure that the United States and the United Kingdom authorities would be in a position to make available exculpatory information to criminal defendants.

Article 8 provides that the Requested Party may compel, if necessary, the taking of testimony or production of documents in its territory on behalf of the Requesting Party. In the event that a person whose testimony or evidence is being taken asserts a claim of immunity, incapacity, or privilege under the laws of the Requesting Party, the testimony or evidence shall be taken and the claim made known to the Requesting Party for resolution by its authorities.

Article 8 also requires the Requested Party, upon request, to inform the Requesting Party in advance of the date and place of the taking of testimony. The Requested Party must also permit the presence of any persons specified in the request (such as the accused, counsel for the accused, or other interested person) and to permit such persons to question the person whose testimony is being taken, through [*10] a legal representative qualified to appear before the courts of the Requested Party. Finally, this article provides a mechanism for authentication of documentary evidence produced pursuant to this article and provides that no further authentication or certification shall be necessary in order for such information to be admissible in evidence in proceedings in the Requesting Party.

Article 9 requires that the Requested Party provide the Requesting Party with copies of publicly available records of government departments and agencies. The Requested Party may further provide copies of other records or information in the possession of a government department or agency but not publicly available to the same extent and under the same conditions as it would to its own law enforcement or judicial authorities. The article requires official authentication of documents furnished, using forms appended to the Treaty and confirms their admissibility in evidence in the Requesting Party if so authenticated.

Article 10 provides a mechanism for a Requesting Party to invite the voluntary appearance and testimony in its territory of a person located in the Requested Party. In such a case, the Central [*11] Authority of the Requested Party is required to invite the person to appear and promptly inform the Central Authority of the Requesting Party of the per-

son's response. The request may state that the Requesting Party will assure the person shall not be subject to service of process or be detained or subjected to restriction of personal liberty, by reason of any acts or convictions which preceded his departure from the territory of the Requested Party. This safe conduct shall cease fifteen days after the Central Authority of the Requesting Party has notified its counterpart that the person's presence is no longer required, or if the person has left the territory of the Requesting Party and voluntarily returns to it.

Article 11 provides for the voluntary transfer to one Party of a person in custody in the other Party, for purposes of assistance under the Treaty, provided that the person in question and both Parties agree. The article establishes the express authority and the obligation for the Requesting Party to maintain the person in custody unless otherwise authorized by the Requested Party. It further specifies the requirements for ensuring the person's safety and return to the Requested [*12] Party.

Article 12 provides that the Requested Party shall use its best efforts to ascertain the location or identity of persons specified in a request and shall promptly notify the Requesting Party of the results of its inquiries.

Under Article 13, a Requested Party shall, to the extent possible, effect service of process of any document requested under the Treaty, including subpoenas or other process requiring the appearance of any person before any authority or tribunal in the territory of the Requesting Party. Such service, however, does not impose an obligation under the law of the Requested Party to comply with such process. The article further requires that any request for the service of a document requiring a person to appear in the territory of the Requesting Party be transmitted a reasonable time before the scheduled appearance. The Requested Party is required to return proof of service.

Article 14 obligates each Party to execute requests for search, seizure, and delivery of any article to the Requesting Party if the request includes the information justifying such action under the laws of the Requested Party and it is carried out in accordance with the laws of that Party. [*13] The Requested Party may refuse such a request if it relates to conduct for which its own powers of search and seizure would not be exercisable in a similar circumstance. The article further provides for the authentication and certification of evidence delivered under this article and provides that the Central Authority of the Requested Party may impose conditions on transfer to protect third party interests in the property.

Article 15 obliges the Requesting Party to return any documents or articles furnished to it under this treaty unless the Central Authority waives such return.

Article 16 obligates the Parties to assist each other in asset forfeiture proceedings. Specifically, the Parties agree to assist each other in proceedings involving the identification, tracing, freezing, seizure, or forfeiture of the proceeds and instrumentalities of crime and to assist each other in relation to proceedings involving the imposition of fines related to a criminal prosecution. Under this article, a Requested Party may transfer forfeited assets or the proceeds of their sale to the other Party to the extent permitted by the former's domestic law, upon such terms as may be agreed.

Article 17 provides [*14] that assistance and procedures provided in this Treaty shall not prevent the Parties from providing assistance to each other through the provisions of other international agreements, national laws, or any other arrangement, agreement, or practice applicable between their law enforcement agencies.

Article 18 provides that the Parties or their Central Authorities shall consult promptly at the request of either, concerning the implementation of this Treaty. Article 18 also contains novel consultative procedures to enable the Parties to have first recourse to the Treaty, with respect to any matter for which assistance could be granted under the Treaty, prior to the enforcement of a "compulsory measure" requiring an action to be performed by a person located in the territory of the other Party. The term "compulsory measure" is described with greater specificity in the interpretative notes. Under the consultative mechanisms for dealing with the enforcement of compulsory measures, if a Party is aware that its authorities are intending to take such compulsory measures, its Central Authority shall inform the other Central Authority, who may request consultations. Should a Central Authority [*15] learn that such measures may be taken in its territory, it may also request consultations. Ultimately, should consultations fail to resolve the matter, cause unreasonable delay, or jeopardize the successful completion of a proceeding, enforcement of the compulsory measure is not foreclosed. In such instance the Central Authority of the Party taking such action may give written notice to the other Central Authority of that circumstance. Article 18 finally provides for a general obligation of the parties to exercise moderation and restraint, even when the Parties' consultation obligations under this article are satisfied.

In addition to the consultative mechanism for compulsory measures described above, the interpretative notes commit the U.S. Department of Justice, on behalf of the United States Government, to take certain specified practical measures to reduce the number of instances in which a conflict of laws, policies, or national interests may arise. Specifically,

the notes state that the Department of Justice shall: (1) Instruct all federal prosecutors not to seek compulsory measures, as referred to in Article 18(2) with respect to any matter for which assistance could be granted [*16] under the Treaty unless the U.S. Central Authority has concluded that the consultative mechanisms in Article 18 have been satisfied; (2) instruct all federal prosecutors not to enforce any compulsory measures, as referred to in Article 18(2), with respect to any matter for which assistance could be granted under the Treaty unless the U.S. Central Authority has concluded that the consultative mechanisms in Article 18 have been satisfied; and (3) undertake to discourage the issue of compulsory measures by other U.S. Government agencies for evidence located in the United Kingdom in any matter covered by the Treaty by advising all such agencies not to seek such process without consultation and coordination with the United States Central Authority.

Article 19 defines the term "proceedings", thus setting forth the matters for which the Parties will provide assistance under the Treaty. As noted above, the term "proceedings" means proceedings related to criminal matters and includes any measure or step taken in connection with the investigation or prosecution of criminal offenses, including the freezing, seizure or forfeiture of the proceeds and instrumentalities of crime, and the imposition [*17] of fines related to a criminal prosecution. Article 19 further provides that the Central Authorities may at their discretion treat as proceedings such hearings before or investigations by any court, administrative agency or administrative tribunal with respect to the imposition of civil or administrative sanctions as may be agreed in writing between the Parties.

Article 20 sets forth the territorial application of the Treaty. With respect to the United Kingdom, the Treaty shall apply to England, Wales, Scotland, Northern Ireland, the Isle of Man, Channel Islands, and to any other territory for whose international relations the United Kingdom is responsible and to which this Treaty shall have been extended by agreement between the Parties.

Article 21 provides that the treaty shall be ratified and shall enter into force upon an exchange of instruments of ratification.

Article 22 provides for termination to be effective six months after written notice of termination is given by one party to the other Party.

A Technical Analysis explaining in detail the provisions of the Treaty is being prepared by the United States negotiating delegation, consisting of representatives from the Departments [*18] of Justice and State, and will be transmitted separately to the Senate Committee on Foreign Relations.

The Department of Justice joins the Department of State in favoring approval of this Treaty and related exchange of notes by the Senate as soon as possible.

Respectfully submitted,

WARREN CHRISTOPHER.

### TREATY BETWEEN THE GOVERNMENT OF THE UNITED STATES OF AMERICA AND THE GOVERNMENT OF THE UNITED KINGDOM OF GREAT BRITAIN AND NORTHERN IRELAND ON MUTUAL LEGAL ASSISTANCE IN CRIMINAL MATTERS

The Government of the United States of America and The Government of the United Kingdom of Great Britain and Northern Ireland,

Desiring to improve the effectiveness of the law enforcement authorities of both countries in the investigation, prosecution, and combatting of crime through cooperation and mutual legal assistance in criminal matters,

Reaffirming their determination to enhance assistance in the fight against crime as set out in the Agreement Concerning the Investigation of Drug Trafficking Offences and the Seizure and Forfeiture of Proceeds and Instrumentalities of Drug Trafficking, done at London February 9, 1988,

Have agreed as follows:

### ARTICLE 1

#### Scope of Assistance

1. The Parties [*19] shall provide mutual assistance, in accordance with the provisions of this Treaty, for the purpose of proceedings as defined in Article 19 of this Treaty.

2. Assistance shall include:

    (a) taking the testimony or statements of persons;

    (b) providing documents, records, and evidence;

    (c) serving documents;

    (d) locating or identifying persons;

    (e) transferring persons in custody for testimony (or other purposes);

    (f) executing requests for searches and seizures;

    (g) identifying, tracing, freezing, seizing, and forfeiting the proceeds and instrumentalities of crime and assistance in related proceedings; and

    (h) such other assistance as may be agreed between Central Authorities.

3. This Treaty is intended solely for mutual legal assistance between the Parties. The provisions of this Treaty shall not give rise to a right on the part of any private person to obtain, suppress, or exclude any evidence, or to impede the execution of a request.

**ARTICLE 2**

**Central Authorities**

1. Central Authorities shall be established by both Parties.

2. For the United States of America, the Central Authority shall be the Attorney General or a person or agency designated by him. For the United Kingdom, [*20] the Central Authority shall be the Secretary of State for the Home Department or a person or agency designated by him.

3. Requests under this Treaty shall be made by the Central Authority of the Requesting Party to the Central Authority of the Requested Party.

4. The Central Authorities shall communicate directly with one another for the purposes of this Treaty.

**ARTICLE 3**

**Limitations on Assistance**

1. The Central Authority of the Requested Party may refuse assistance if:

    (a) the Requested Party is of the opinion that the request, if granted, would impair its sovereignty, security, or other essential interests or would be contrary to important public policy;

    (b) the request relates to an offender who, if proceeded against in the Requested Party for the offence for which assistance is requested, would be entitled to be discharged on the grounds of a previous acquittal or conviction; or

    (c) the request relates to an offence that is regarded by the Requested Party as:

        (i) an offence of a political character; or

        (ii) an offence under military law of the Requested Party which is not also an offence under the ordinary criminal law of the Requested Party.

2. Before denying [*21] assistance pursuant to this Article, the Central Authority of the Requested Party shall consult with the Central Authority of the Requesting Party to consider whether assistance can be given subject to such conditions as it deems necessary. If the Requesting Party accepts assistance subject to these conditions, it shall comply with the conditions.

**ARTICLE 4**

**Form and Contents of Requests**

1. Requests shall be submitted in writing. However, in urgent circumstances, the request may be made orally but shall be confirmed in writing within ten days thereafter.

2. The request shall include the following:

1994 U.S.T. LEXIS 205, *

(a) the name of the authority conducting the proceedings to which the request relates;
(b) the subject matter and nature of the proceedings for the purposes of which the request is made;
(c) a summary of the information giving rise to the request;
(d) a description of the evidence or information or other assistance sought; and
(e) the purpose for which the evidence or information or other assistance is sought.

3. To the extent necessary and possible, a request shall also include:

(a) the identity, date of birth and location of any person from whom evidence is sought;
(b) the [*22] identity, date of birth and location of a person to be served, that person's relationship to the proceedings, and the manner in which the service is to be made;
(c) available information on the identity and whereabouts of a person to be located;
(d) a precise description of the place or person to be searched and of the articles to be seized; .
(e) a description of the manner in which any testimony or statement is to be taken and recorded;
(f) a list of questions to be asked of a witness;
(g) a description of any particular procedures to be followed in executing the request;
(h) information as to the allowances and expenses to which a person asked to appear in the territory of the Requesting Party will be entitled;
(i) any other information which may be brought to the attention of the Requested Party to facilitate its execution of the request; and
(j) requirements for confidentiality.

4. The Requested Party may ask the Requesting Party to provide any further information which appears to the Requested Party to be necessary for the purpose of executing the request.

## ARTICLE 5

### Execution of Requests

1. As empowered by this Treaty or by national law, or in accordance with its national [*23] practice, the Requested Party shall take whatever steps it deems necessary to give effect to requests received from the Requesting Party. The courts of the Requested Party shall have authority to issue subpoenas, search warrants, or other orders necessary to execute the request.

2. When execution of the request requires judicial or administrative action, the request shall be presented to the appropriate authority by the persons appointed by the Central Authority of the Requested Party.

3. The method of execution specified in the request shall be followed to the extent that it is not incompatible with the laws and practices of the Requested Party.

4. If the Central Authority of the Requested Party determines that execution of the request would interfere with ongoing proceedings or prejudice the safety of any person in the territory of the Requested Party, the Central Authority of that Party may postpone execution, or make execution subject to conditions determined necessary after consultation with the Requesting Party. If the Requesting Party accepts the assistance subject to the conditions, it shall comply with the conditions.

5. The Central Authority of the Requested Party shall [*24] facilitate the participation in the execution of the request of such persons as are specified in the request.

6. The Central Authority of the Requested Party may ask the Central Authority of the Requesting Party to provide information in such form as may be necessary to enable it to execute the request or to undertake any steps which may be necessary under the laws and practices of the Requested Party in order to give effect to the request received from the Requesting Party.

7. The Central Authority of the Requesting Party shall inform the Central Authority of the Requesting Party promptly of any circumstances which make it inappropriate to proceed with the execution of the request or which require modification of the action requested.

8. The Central Authority of the Requested Party shall promptly inform the Central Authority of the Requesting Party of the outcome of the execution of the request. If the request is denied, the Central Authority of the Requested Party shall inform the Central Authority of the reasons for the denial.

## ARTICLE 6

### Costs

1. The Requested Party shall, subject to paragraph (2) of this Article, pay all costs relating to the execution of the request, except [*25] for the fees of expert witnesses and the allowances and expenses related to the travel of persons pursuant to Articles 10 and 11 of this Treaty, which fees, allowances, and expenses shall be paid by the Requesting Party.

2. If the Central Authority of the Requested Party notifies the Central Authority of the Requesting Party that execution of the request might require costs or other resources of an extraordinary nature, or if it otherwise requests, the Central Authorities shall consult with a view to reaching agreement on the conditions under which the request shall be executed and the manner in which costs shall be allocated.

### ARTICLE 7

Confidentiality and Limitations on Use

1. The Requested Party shall, upon request, keep confidential any information which might indicate that a request has been made or responded to. If the request cannot be executed without breaching confidentiality, the Requested Party shall so inform the Requesting Party, which shall then determine the extent to which it wishes the request to be executed.

2. The Requesting Party shall not use or disclose any information or evidence obtained under this Treaty for any purposes other than for the proceedings stated [*26] in the request without the prior consent of the Requested Party.

3. Unless otherwise indicated by the Requested Party when executing the request, information or evidence, the contents of which have been disclosed in a public judicial or administrative hearing related to the request, may thereafter be used for any purpose.

### ARTICLE 8

Taking Testimony and Producing Evidence in the Territory of the Requested Party

1. A person in the territory of the Requested Party from whom evidence is requested pursuant to this Treaty may be compelled, if necessary, to appear in order to testify or produce documents, records, or articles of evidence by subpoena or such other method as may be permitted under the law of the Requested Party.

2. A person requested to testify or to produce documentary information or articles in the territory of the Requested Party may be compelled to do so in accordance with the requirements of the law of the Requested Party. If such a person asserts a claim of immunity, incapacity or privilege under the laws of the Requesting Party, the evidence shall nonetheless be taken and the claim be made known to the Requesting Party for resolution by the authorities of that Party. [*27]

3. Upon request, the Central Authority of the Requested Party shall furnish information in advance about the date and place of the taking of the evidence pursuant to this Article.

4. The Requested Party shall allow persons specified in the request to ask questions of the person whose testimony or evidence is being taken, through a legal representative qualified to appear before the courts of the Requested Party.

5. Documentary information produced pursuant to this Article may be authenticated by the attestation of a person competent to do so in the form indicated in Appendix A to this Treaty. No further authentication or certification shall be necessary in order for such documentary information to be admissible in evidence in proceedings in the territory of the Requesting Party. Documentary information produced pursuant to this Article may also be authenticated pursuant to such other form or manner as may be prescribed from time to time by either Central Authority.

### ARTICLE 9

Records of Government Agencies

1. The Requested Party shall provide the Requesting Party with copies of publicly available records of government departments and agencies of the Requested Party.

2. The Requested [*28] Party may provide a copy of any record or information in the possession of a government department or agency but not publicly available to the same extent and on the same conditions as to its own law enforcement or judicial authorities. The Requested Party may refuse a request pursuant to this paragraph entirely or in part.

3. Official records provided pursuant to this Article shall be authenticated by the Central Authority of the Requested Party in the manner indicated in Appendix B to this Treaty. No further authentication or certification shall be necessary in order for such records to be admissible in evidence in proceedings in the territory of the Requesting Party. Records provided pursuant to this Article may also be authenticated pursuant to such other form or manner as may be prescribed from time to time by either Central Authority.

ARTICLE 10

Personal Appearance in the Territory of the Requesting Party

1. A request under this Treaty may seek assistance in facilitating the appearance of any person in the territory of the Requesting Party for the purpose of giving evidence before a court or of being identified in, or otherwise by his presence assisting, any proceedings.

2. [*29] The Central Authority of the Requested Party shall:

(a) ask a person whose voluntary appearance in the territory of the Requesting Party is desired whether he agrees to appear; and
(b) promptly inform the Central Authority of the Requesting Party of his answer.

3. If the Central Authority of the Requesting Party so indicates, a person agreeing to appear in the territory of the Requesting Party pursuant to this article shall not be subject to service of process, or be detained or subjected to any restriction of personal liberty, by reason of any acts or convictions which preceded his departure from the territory of the Requested Party.

4. The safe conduct provided for by this Article shall cease fifteen days after the Central Authority of the Requesting Party has notified the Central Authority of the Requested Party that the person's presence is no longer required, or if the person has left the territory of the Requesting Party and voluntarily returned to it.

ARTICLE 11

Transfer of Persons in Custody

1. A person in the custody of one Party whose presence in the territory of the other Party is sought for the purpose of providing assistance under this Treaty shall be transferred for [*30] that purpose if the person and both Parties consent.

2. For the purposes of this Article:

(a) the Requesting Party shall be responsible for the safety of the person transferred and shall have the authority and the obligation to keep the person transferred in custody unless otherwise authorised by the Requested Party;
(b) the Requesting Party shall return the person transferred to the custody of the Requested Party as soon as circumstances permit and in any event no later than the date upon which he would have been released from custody in the territory of the Requested Party, unless otherwise agreed by both Central Authorities and the person transferred; and

(c) the Requesting Party shall not require the Requested Party to initiate extradition proceedings for the return of the person transferred.

ARTICLE 12

Location or Identification of Persons

1. The Requested Party shall make best efforts to ascertain the location or identity of persons specified in the request.

2. The Central Authority of the Requested Party shall promptly communicate the results of its inquiries to the Central Authority of the Requesting Party.

ARTICLE 13

Service of Documents

1. The Requested Party shall, [*31] as far as possible, effect service of any document relating to or forming part of any request for assistance properly made pursuant to this Treaty by the Requesting Party, including any subpoena or other process requiring the appearance of any person before any authority or tribunal in the territory of the Requesting Party.

2. Service of any subpoena or other process by virtue of paragraph (1) of this Article shall not impose any obligation under the law of the Requested Party to comply with it.

3. The Central Authority of the Requesting Party shall transmit any request for the service of a document requiring the appearance of a person before an authority in the Requesting Party a reasonable time before the scheduled appearance.

4. The Requested Party shall return a proof of service in the manner specified in the request.

ARTICLE 14

Search and Seizure

1. The Requested Party shall execute a request for the search, seizure and delivery of any article to the Requesting Party if the request includes the information justifying such action under the laws of the Requested Party and it is carried out in accordance with the laws of that Party.

2. The Requested Party may refuse a request if [*32] it relates to conduct in respect of which powers of search and seizure would not be exercisable in the territory of the Requested Party in similar circumstances.

3. Every official who has custody of a seized article shall certify the continuity of custody, the identity of the article and the integrity of its condition in the form indicated in Appendix C to this Treaty. No further authentication or certification shall be necessary in order to establish these matters in proceedings in the territory of the Requesting Party. Certification under this Article may also be provided in any other form or manner as may be prescribed from time to time by either Central Authority.

4. The Central Authority of the Requested Party may require that the Requesting Party agree to terms and conditions which the Requested Party may deem necessary to protect third party interests in the item to be transferred.

ARTICLE 15

Return of Documents and Articles

The Central Authority of the Requesting Party shall return any documents or articles furnished to it in the execution of a request under this Treaty as soon as is practicable unless the Central Authority of the Requested Party waives the return of the documents [*33] or articles.

ARTICLE 16

Assistance in Forfeiture Proceedings

1. The Parties shall assist each other in proceedings involving the identification, tracing, freezing, seizure or forfeiture of the proceeds and instrumentalities of crime and in relation to proceedings involving the imposition of fines related to a criminal prosecution.

2. If the Central Authority of one Party becomes aware that proceeds or instrumentalities are located in the territory of the other Party and may be liable to freezing, seizure or forfeiture under the laws of that Party, it may so inform the Central Authority of the other Party. If the Party so notified has jurisdiction, this information may be presented to its authorities for a determination whether any action is appropriate. The said authorities shall issue their decision in accordance with the laws of their country and the Central Authority of that country shall ensure that the other Party is aware of the action taken.

3. A Requested Party in control of forfeited proceeds or instrumentalities shall dispose of them according to its laws. Either Party may transfer forfeited assets or the proceeds of their sale to the other Party to the extent permitted [*34] by their respective laws, upon such terms as may be agreed.

ARTICLE 17

Compatibility with Other Arrangements

Assistance and procedures set forth in this Treaty shall not prevent either of the Parties from granting assistance to the other Party through the provisions of other international agreements to which it may be a party, or through the provisions of its national laws. The Parties may also provide assistance pursuant to any arrangement, agreement, or practice which may be applicable between the law enforcement agencies of the Parties.

ARTICLE 18

Consultation

1. The Parties, or Central Authorities, shall consult promptly, at the request of either, concerning the implementation of this Treaty either generally or in relation to a particular case. Such consultation may in particular take place if, in the opinion of either Party or Central Authority, the expenses or other resources required for the implementation of this Treaty are of an extraordinary nature, or if either Party has rights or obligations under another bilateral or multilateral agreement relating to the subject matter of this Treaty.

2. With respect to any matter for which assistance could be granted under this Treaty, [*35] neither Party shall enforce any compulsory measure requiring an action to be performed by any person located in the territory of the other Party, unless the Party proposing such enforcement has first exhausted the procedures established in paragraphs (3) and (4) of this Article.

3. If a Party is aware that its authorities are intending to take measures referred to in paragraph (2) of this Article, its Central Authority shall inform the other Central Authority, who may request consultations. If the other Party is aware of or considers that the authorities of the first Party have taken or are about to take any such measures, its Central Authority may request consultations. Thereafter, the Central Authorities shall consult with a view to determining whether the assistance sought can be provided under this Treaty, or otherwise resolving the matter.

4. Where consultations fail to resolve the matter, or unreasonable delay may be jeopardizing the successful completion of a proceeding, either Central Authority may give the other written notice to that effect.

5. Unless otherwise agreed by the Parties, the obligations under paragraphs (2), (3) and (4) of this Article shall have been fulfilled [*36] 21 days after receipt of this written notice, provided that this is not less than 60 days after receipt of the request referred to in paragraph (3) above.

6. Even in those cases in which the Parties' obligations under this Article have been fulfilled, each Party shall continue to exercise moderation and restraint.

ARTICLE 19

Definitions

1. For the purposes of this Treaty, "proceedings" means proceedings related to criminal matters and includes any measure or step taken in connection with the investigation or prosecution of criminal offences, including the freezing, seizure or forfeiture of the proceeds and instrumentalities of crime, and the imposition of fines related to a criminal prosecution.

2. In addition, the Central Authorities may at their discretion treat as proceedings for the purpose of this Treaty such hearings before or investigations by any court, administrative agency or administrative tribunal with respect to the imposition of civil or administrative sanctions as may be agreed in writing between the Parties.

ARTICLE 20

Territorial Application

This Treaty shall apply:

1. in relation to the United Kingdom:

    (a) to England and Wales, Scotland, and Northern Ireland; [*37] and

    (b) to the Isle of Man, Channel Islands and to any other territory for whose international relations the United Kingdom is responsible and to which this Treaty shall have been extended by agreement between the Parties, subject to any technical modifications agreed by the Parties and to either Party being able to terminate such extension by giving six months written notice to the other through the diplomatic channel; and

2. to the United States of America.

ARTICLE 21

Ratification and Entry into Force

1. This Treaty shall be ratified, and the instruments of ratification shall be exchanged at London as soon as possible.

2. This Treaty shall enter into force upon the exchange of instruments of ratification.

ARTICLE 22

Termination

Either Party may terminate this Treaty by means of a written notice to the other Party. Termination shall take effect six months following the date of notification.

IN WITNESS WHEREOF, the undersigned, being duly authorized by their respective Governments, have signed this Treaty.

DONE in duplicate at Washington this sixth day of January, 1994.

FOR THE GOVERNMENT OF THE UNITED STATES OF AMERICA:

FOR THE GOVERNMENT OF THE UNITED KINGDOM OF GREAT [*38] BRITAIN AND NORTHERN IRELAND:

DEPARTMENT OF STATE WASHINGTON

January 6, 1994

Excellency:

I have the honor to acknowledge receipt of Your Excellency's Note of today's date, which reads as follows:

"I have the honour to refer to the Treaty between the Government of the United States of America and the Government of the United Kingdom of Great Britain and Northern Ireland on Mutual Legal Assistance in Criminal Matters (the Treaty) signed today. I have the honour to propose that the Treaty be applied in accordance with the provisions set out in this Note.

    (a) The term 'important public policy' in Article 3(1)(a) would include a Requested Party's policy of opposing the exercise of jurisdiction which in its view is extraterritorial and objectionable.

    (b) Article 3(1)(b) shall not affect the availability of assistance in respect of other participants in the offense for which assistance is requested who would not be entitled to be discharged on the grounds of previous acquittal or conviction.

    (c) Article 7(2) shall not preclude the use or disclosure of information to the extent that there is an obligation to do so under the Constitution or law of the Requesting Party in a criminal prosecution. [*39] Any such proposed disclosure shall be notified by the Requesting Party to the Requested Party in advance.

(d) The Treaty shall not apply to anti-trust or competition law investigations or proceedings at this time. The Central Authorities may at their discretion treat as proceedings for the purpose of this Treaty such anti-trust or competition law matters, or anti-trust or competition law matters generally, as may be agreed in writing between the Parties at a later date.

(e) 'Compulsory measures' in Article 18, including in the case of the United States a grand jury subpoena, are those measures that require an action to be performed by any person located in the territory of the Party not issuing the measure and that fall within the following categories:

(i) any measure for the production of evidence located in the territory of the Party not issuing the measure;

(ii) any measure relating to assets in the territory of the Party not issuing the measure; or

(iii) any measure compelling a natural person who is in the territory of one Party to make a personal appearance in the territory of the other Party unless:

a) the Party compelling the appearance has lawfully obtained jurisdiction over [*40] that person; or

b) the person is a national of the Party compelling the appearance, without prejudice to whether a Party objects to these compulsory measures or the jurisdiction claimed by the other Party.

The Central Authorities may add to or amend the categories referred to above as may be agreed in writing between the Parties.

(f) In the spirit of cooperation, mutual respect, and good will, and in the interests of facilitating the cooperative use of the Treaty with respect to proceedings that fall within its scope and of avoiding measures which could result in a conflict of laws, policies, or national interests, the United States Government shall take several practical measures to reduce the number of instances in which conflict may be anticipated. In particular, the United States Department of Justice, on behalf of the United States Government, shall:

(i) instruct all federal prosecutors not to seek compulsory measures, as referred to in Article 18(2), with respect to any matter for which assistance could be granted under the Treaty unless the United States Central Authority has concluded that the provisions of Article 18 of the Treaty have been satisfied;

(ii) instruct all [*41] federal prosecutors not to enforce any compulsory measures, as referred to in Article 18(2), with respect to any matter for which assistance could be granted under the Treaty, unless the United States Central Authority has concluded that the provisions of Article 18 have been satisfied; and

(iii) undertake to discourage the issue of compulsory measures by other United States Government agencies for evidence located in the United Kingdom in any matter covered by the Treaty by advising all such agencies not to seek such process without consultation and coordination with the United States Central Authority.

If the above proposal is acceptable to the Government of the United States of America, I have the honour to propose that this Note and Your Excellency's reply to that effect shall constitute an agreement between our two Governments, which shall enter into force on the date of entry into force of the Treaty.

I have the honour to convey to Your Excellency the assurance of my highest consideration."

I have the further honor to inform Your Excellency that the foregoing proposals are acceptable to the Government of the United States of America and that Your Excellency's Note and this [*42] Note shall constitute an agreement between our two Governments, which shall enter into force on the date of entry into force of the Treaty.

For The Secretary of State:

His Excellency

Sir Robin W. Renwick, K.C.M.G.,

Ambassador of the United Kingdom of Great Britain and Northern Ireland.

British Embassy

Washington D.C.

His Excellency
Warren M Christopher
Secretary of State of the United States of America    6 January 1994

Your Excellency,

I have the honour to refer to the Treaty between the Government of The United States of America and the Government of the United Kingdom of Great Britain and Northern Ireland on Mutual Legal Assistance in Criminal Matters (the Treaty) signed today. I have the honour to propose that the Treaty be applied in accordance with the provisions set out in this Note.

(a) The term "important public policy" in Article 3(1) (a) would include a Requested Party's policy of opposing the exercise of jurisdiction which in its view is extraterritorial and objectionable.

(b) Article 3 (1) (b) shall not affect the availability of assistance in respect of other participants in the offence for which assistance is requested who would not be entitled to be discharged [*43] on the grounds of previous acquittal or conviction.

(c) Article 7(2) shall not preclude the use or disclosure of information to the extent that there is an obligation to do so under the Constitution or law of the Requesting Party in a criminal prosecution. Any such proposed disclosure shall be notified by the Requesting Party to the Requested Party in advance.

(d) The Treaty shall not apply to anti-trust or competition law investigations or proceedings at this time. The Central Authorities may at their discretion treat as proceedings for the purpose of this Treaty such anti-trust or competition law matters, or anti-trust or competition law matters generally, as may be agreed in writing between the Parties at a later date.

(e) "Compulsory measures" in Article 18, including in the case of the United States a grand jury subpoena, are those measures that require an action to be performed by any person located in the territory of the Party not issuing the measure and that fall within the following categories:

(i) any measure for the production of evidence located in the territory of the Party not issuing the measure;

(ii) any measure relating to assets in the territory of the [*44] Party not issuing the measure; or

(iii) any measure compelling a natural person who is in the territory of one Party to make a personal appearance in the territory of the other Party unless:

a) the Party compelling the appearance has lawfully obtained jurisdiction over that person; or

b) the person is a national of the Party compelling the appearance,

without prejudice to whether a Party objects to these compulsory measures or the jurisdiction claimed by the other Party.

The Central Authorities may add to or amend the categories referred to above as may be agreed in writing between the Parties.

(f) In the spirit of cooperation, mutual respect, and good will, and in the interests of facilitating the cooperative use of the Treaty with respect to proceedings that fall within its scope and of avoiding measures which could result in a conflict of laws, policies, or national interests, the United States Government shall take several practical measures to reduce the number of instances in which conflict may be anticipated. In particular, the United States Department of Justice, on behalf of the United States Government, shall:

(i) instruct all federal prosecutors not [*45] to seek compulsory measures, as referred to in Article 18(2), with respect to any matter for which assistance could be granted under the Treaty unless the United States Central Authority has concluded that the provisions of Article 18 of the Treaty have been satisfied;

(ii) instruct all federal prosecutors not to enforce any compulsory measures, as referred to in Article 18(2), with respect to any matter for which assistance could be granted under the Treaty, unless the United States Central Authority has concluded that the provisions of Article 18 have been satisfied; and

(iii) undertake to discourage the issue of compulsory measures by other United States Government agencies for evidence located in the United Kingdom in any matter covered by the Treaty by advising all such agencies not to seek such process without consultation and coordination with the United States Central Authority.

If the above proposal is acceptable to the Government of the United States of America, I have the honour to propose that this Note and Your Excellency's reply to that effect shall constitute an agreement between our two Governments, which shall enter into force on the date of entry into force [*46] of the Treaty.

I have the honour to convey to

Your Excellency the assurance of my highest consideration.

ROBIN W RENWICK

**APPENDICES:**
Appendix A

CERTIFICATE OF AUTHENTICITY OF BUSINESS RECORDS

I, ___(Name), attest on penalty of criminal punishment for false statement or false attestation that I am employed by ___ (Name of Business from which documents are produced) and that my official title is ___ (Official Title). I further state that each of the records attached hereto is the original or a duplicate of the original of records in the custody of ___ (Name of Business from which documents are produced). I further state that:

A) such records were made at or near the time of the occurrence of the matters set forth, by (or from information transmitted by) a person with knowledge of those matters;
B) such records were kept in the course of a regularly conducted business activity;
C) the business activity made the records as a regular practice; and
D) if any of such records is not the original, such record is a duplicate of the original.

___ (Signature)   (Date)

Sworn to or affirmed before me, ___ (Name), a ___ (notary public, judicial officer, etc.), this ___ day of ___, 199_.

Appendix B [*47]

ATTESTATION OF AUTHENTICITY OF FOREIGN PUBLIC DOCUMENTS

I, ___(Name), attest on penalty of criminal punishment for false statement or attestation that my position with the Government of ___ (Country) is ___ (Official Title) and that in that position I am authorized by the law of ___ (Country) to attest that the documents attached and described below are true and accurate copies of original official records which are recorded or filed in ___ (Name of Office or Agency) which is a government office or agency of the Government of ___ (Country).

Description of Documents:

___ (Signature)

___ (Title)

___ (Date)

Appendix C

ATTESTATION WITH RESPECT TO SEIZED ARTICLES

I, ___ (Name), attest on penalty of criminal punishment for false statement or attestation that my position with the Government of ___ (Country) is ___ (Title). I received custody of the articles listed below from ___ (Name of Person) on ___ (Date), at ___ (Place). I relinquished custody of the articles listed below to ___ (Name of Person) on ___ (Date) at ___ (Place) in the same condition as when I received them (or if different, as noted below).

Description of Articles:

Changes in condition while in my custody:

Official [*48] Seal   ___ (Signature)

___ (Title)

___ (Place)

___ (Date)

Instrument as contemplated by Article 3(2) of the Agreement on Mutual Legal Assistance between the United States of America and the European Union signed 25 June 2003, as to the application of the Treaty between the Government of the United States of America and the Government of the United Kingdom of Great Britain and Northern Ireland on Mutual Legal Assistance in Criminal Matters signed 6 January 1994

1. As contemplated by Article 3(2) of the Agreement on Mutual Legal Assistance between the United States of America and the European Union signed 25 June 2003 (hereafter "the Mutual Legal Assistance Agreement"), the Governments of the United States of America and the United Kingdom of Great Britain and Northern Ireland acknowledge that, in accordance with the provisions of this Instrument, the Mutual Legal Assistance Agreement is applied in relation to the bilateral Treaty between the Government of the United States of America and the Government of the United Kingdom of Great Britain and Northern Ireland on Mutual Legal Assistance in Criminal Matters signed 6 January 1994 (hereafter "the 1994 Mutual Legal Assistance Treaty") under the following terms:
(a) Article 4 of the Mutual Legal Assistance Agreement shall be applied as set forth in Article 16 bis of the Annex to this Instrument to provide for the identification of financial accounts and transactions, in addition to any authority already provided under the 1994 Mutual Legal Assistance Treaty;
(b) Article 5 of the Mutual Legal Assistance Agreement shall be applied as set forth in Article 16 ter of the Annex to this Instrument to provide for the formation and activities of joint investigative teams, in addition to any authority already provided under the 1994 Mutual Legal Assistance Treaty;
(c) Article 6 of the Mutual Legal Assistance Agreement shall be applied as set forth in Articles 6 and 16 quater of the Annex to this Instrument to provide for the taking of testimony of a person located in the Requested Party by use of video transmission technology between the Requesting and Requested Parties, in addition to any authority already provided under the 1994 Mutual Legal Assistance Treaty;
(d) Article 7 of the Mutual Legal Assistance Agreement shall be applied as set forth in Article 4 (1) of the Annex to this Instrument to provide for the use of expedited means of communication, in addition to any authority already provided under the 1994 Mutual Legal Assistance Treaty;
(e) Article 8 of the Mutual Legal Assistance Agreement shall be applied as set forth in Article 1 (1 bis) of the Annex to this Instrument to provide for mutual legal assistance to the administrative authorities concerned, in addition to any authority already provided under the 1994 Mutual Legal Assistance Treaty;
(f) Article 9 of the Mutual Legal Assistance Agreement shall be applied as set forth in Article 7 of the Annex to this Instrument to provide for limitations on use of information or evidence provided to the Requesting Party, and the conditioning or refusal of assistance on data protection grounds.

2. The Annex reflects the integrated text of the operative provisions of the 1994 Mutual Legal Assistance Treaty and the Mutual Legal Assistance Agreement that shall apply upon entry into force of this Instrument.

3. (a) This Instrument shall apply to the United States of America and to Great Britain and Northern Ireland. Subject to subparagraph b), the application of the 1994 Mutual Legal Assistance Treaty to the Channel Islands, the Isle of Man, and any other territory of the United Kingdom to which the 1994 Mutual Legal Assistance Treaty may apply in accordance with its terms, shall remain unaffected by the Mutual Legal Assistance Agreement and this Instrument.

(b) This Instrument shall not apply to any territory for whose international relations the United Kingdom is responsible unless the United States of America and the European Union, by exchange of diplomatic notes duly confirmed by the United Kingdom in accordance with Article 16(1)(b) of the Mutual Legal Assistance Agreement, agree to

extend its application thereto with such technical modifications as may be agreed between the United States of America and the United Kingdom. Such application may be terminated by either the United States of America or the European Union by giving six months' written notice to the other through the diplomatic channel where duly confirmed between the United States of America and the United Kingdom in accordance with Article 16(2) of the Mutual Legal Assistance Agreement.

4. In accordance with Article 12 of the Mutual Legal Assistance Agreement, this Instrument shall apply to offences committed before as well as after it enters into force.

5. This Instrument shall not apply to requests made prior to its entry into force; except that, in accordance with Article 12 of the Mutual Legal Assistance Agreement, Articles 4(1), 6 and 16 quater of the Annex shall be applicable to requests made prior to such entry into force.
6. (a) This Instrument shall be subject to the completion by the United States of America and the United Kingdom of Great Britain and Northern Ireland of their respective applicable internal procedures for entry into force. The Governments of the United States of America and the United Kingdom of Great Britain and Northern Ireland shall thereupon exchange instruments indicating that such measures have been completed. This Instrument shall enter into force on the date of entry into force of the Mutual Legal Assistance Agreement.
(b) In the event of termination of the Mutual Legal Assistance Agreement, this Instrument shall be terminated and the 1994 Mutual Legal Assistance Treaty shall be applied. The Governments of the United States of America and the United Kingdom of Great Britain and Northern Ireland nevertheless may agree to continue to apply some or all of the provisions of this Instrument.

IN WITNESS WHEREOF, the undersigned, being duly authorized by their respective Governments, have signed this Instrument.

DONE at London, in duplicate, this 16th day of December 2004.


FOR THE GOVERNMENT OF THE UNITED STATES OF AMERICA:

[Signature]

FOR THE GOVERNMENT OF THE UNITED KINGDOM OF GREAT BRITAIN AND NORTHERN IRELAND:

[Signature]

ANNEX TREATY BETWEEN THE GOVERNMENT OF THE UNITED STATES OF AMERICA AND THE GOVERNMENT OF THE UNITED KINGDOM OF GREAT BRITAIN AND NORTHERN IRELAND ON MUTUAL LEGAL ASSISTANCE IN CRIMINAL MATTERS

ARTICLE 1 Scope of Assistance

1. The Parties shall provide mutual assistance, in accordance with the provisions of this Treaty, for the purpose of proceedings as defined in Article 19 of this Treaty.

1 *bis*. Mutual legal assistance shall also be afforded to a national administrative authority, investigating conduct with a view to a criminal prosecution of the conduct, or referral of the conduct to criminal investigation or prosecution authorities, pursuant to its specific administrative or regulatory authority to undertake such investigation. Mutual legal assistance may also be afforded to other administrative authorities under such circumstances. Assistance shall not be available for matters in which the administrative authority anticipates that no prosecution or referral, as applicable, will take place. Requests for assistance under this paragraph shall be transmitted between the Central Authorities designated pursuant to Article 2 of this Treaty, or between such other authorities as may be agreed by the Central Authorities.

2. Assistance shall include:
(a) taking the testimony or statements of persons;
(b) providing documents, records, and evidence;
(c) serving documents;
(d) locating or identifying persons;
(e) transferring persons in custody for testimony (or other purposes);
(f) executing requests for searches and seizures;
(g) identifying, tracing, freezing, seizing, and forfeiting the proceeds and instrumentalities of crime and assistance in related proceedings; and
(h) such other assistance as may be agreed between Central Authorities.

3. This Treaty is intended solely for mutual legal assistance between the Parties. The provisions of this Treaty shall not give rise to a right on the part of any private person to obtain, suppress, or exclude any evidence, or to impede the execution of a request.


ARTICLE 2 Central Authorities

1. Central Authorities shall be established by both Parties.

2. For the United States of America, the Central Authority shall be the Attorney General or a person or agency designated by him. For the United Kingdom, the Central Authority shall be the Secretary of State for the Home Department or a person or agency designated by him.

3. Except as otherwise provided in this Treaty, requests under this Treaty shall be made by the Central Authority of the Requesting Party to the Central Authority of the Requested Party.

4. The Central Authorities shall communicate directly with one another for the purposes of this Treaty.


ARTICLE 3 Limitations on Assistance

1. The Central Authority of the Requested Party may refuse assistance if:
(a) the Requested Party is of the opinion that the request, if granted, would impair its sovereignty, security, or other essential interests or would be contrary to important public policy;
(b) the request relates to an offender who, if proceeded against in the Requested Party for the offence for which assistance is requested, would be entitled to be discharged on the grounds of a previous acquittal or conviction; or
(c) the request relates to an offence that is regarded by the Requested Party as:
(i) an offence of a political character; or

(ii) an offence under military law of the Requested Party which is not also an offence under the ordinary criminal law of the Requested Party.

2. Before denying assistance pursuant to this Article, the Central Authority of the Requested Party shall consult with the Central Authority of the Requesting Party to consider whether assistance can be given subject to such conditions as it deems necessary. If the Requesting Party accepts assistance subject to these conditions, it shall comply with the conditions.

## ARTICLE 4 Form and Contents of Requests

1.a) Requests for mutual legal assistance and communications related thereto may be made and responded to by expedited means of communications, including fax or e-mail, with formal confirmation of requests to follow where required by the Requested Party.

b) In urgent cases, requests for mutual legal assistance may be made orally but shall be confirmed in writing within ten days.

c) The Requested Party may respond by any such expedited means of communication.

2. The request shall include the following:
(a) the name of the authority conducting the proceedings to which the request relates;
(b) the subject matter and nature of the proceedings for the purposes of which the request is made;
(c) a summary of the information giving rise to the request;
(d) a description of the evidence or information or other assistance sought; and
(e) the purpose for which the evidence or information or other assistance is sought.

3. To the extent necessary and possible, a request shall also include:
(a) the identity, date of birth and location of any person from whom evidence is sought;
(b) the identity, date of birth and location of a person to be served, that person's relationship to the proceedings, and the manner in which the service is to be made;
(c) available information on the identity and whereabouts of a person to be located;
(d) a precise description of the place or person to be searched and of the articles to be seized;
(e) a description of the manner in which any testimony or statement is to be taken and recorded;
(f) a list of questions to be asked of a witness;
(g) a description of any particular procedures to be followed in executing the request;
(h) information as to the allowances and expenses to which a person asked to appear in the territory of the Requesting Party will be entitled;
(i) any other information which may be brought to the attention of the Requested Party to facilitate its execution of the request; and
(j) requirements for confidentiality.

4. The Requested Party may ask the Requesting Party to provide any further information which appears to the Requested Party to be necessary for the purpose of executing the request.

## ARTICLE 5 Execution of Requests

1. As empowered by this Treaty or by national law, or in accordance with its national practice, the Requested Party shall take whatever steps it deems necessary to give effect

to requests received from the Requesting Party. The courts of the Requested Party shall have authority to issue subpoenas, search warrants, or other orders necessary to execute the request.

2. When execution of the request requires judicial or administrative action, the request shall be presented to the appropriate authority by the persons appointed by the Central Authority of the Requested Party.

3. The method of execution specified in the request shall be followed to the extent that it is not incompatible with the laws and practices of the Requested Party.

4. If the Central Authority of the Requested Party determines that execution of the request would interfere with ongoing proceedings or prejudice the safety of any person in the territory of the Requested Party, the Central Authority of that Party may postpone execution, or make execution subject to conditions determined necessary after consultation with the Requesting Party. If the Requesting Party accepts the assistance subject to the conditions, it shall comply with the conditions.

5. The Central Authority of the Requested Party shall facilitate the participation in the execution of the request of such persons as are specified in the request.

6. The Central Authority of the Requested Party may ask the Central Authority of the Requesting Party to provide information in such form as may be necessary to enable it to execute the request or to undertake any steps which may be necessary under the laws and practices of the Requested Party in order to give effect to the request received from the Requesting Party.

7. The Central Authority of the Requesting Party shall inform the Central Authority of the Requested Party promptly of any circumstances which make it inappropriate to proceed with the execution of the request or which require modification of the action requested.

8. The Central Authority of the Requested Party shall promptly inform the Central Authority of the Requesting Party of the outcome of the execution of the request. If the request is denied, the Central Authority of the Requested Party shall inform the Central Authority of the reasons for the denial.

### ARTICLE 6 Costs

1. The Requested Party shall, subject to paragraphs (2) and (3) of this Article, pay all costs relating to the execution of the request, except for the fees of expert witnesses and the allowances and expenses related to the travel of persons pursuant to Articles 10 and 11 of this Treaty, which fees, allowances, and expenses shall be paid by the Requesting Party.

2. If the Central Authority of the Requested Party notifies the Central Authority of the Requesting Party that execution of the request might require costs or other resources of an extraordinary nature, or if it otherwise requests, the Central Authorities shall consult with a view to reaching agreement on the conditions under which the request shall be executed and the manner in which costs shall be allocated.

3. Unless otherwise agreed by the Requesting and Requested Parties, the Requesting Party shall bear the costs associated with establishing and servicing the video transmission under Article 16 quater. Other costs arising in the course of providing assistance (including costs associated with travel of participants in the Requested Party) shall be borne in accordance with the other provisions of this Article.

ARTICLE 7 Confidentiality and Limitations on Use

1. The Requested Party shall, upon request, keep confidential any information which might indicate that a request has been made or responded to. If the request cannot be executed without breaching confidentiality, the Requested Party shall so inform the Requesting Party, which shall then determine the extent to which it wishes the request to be executed.

2. The Requesting Party may use any evidence or information obtained from the Requested Party:

(a) for the purpose of its criminal investigations and proceedings;

(b) for preventing an immediate and serious threat to its public security;

(c) in its non-criminal judicial or administrative proceedings directly related to investigations or proceedings:
(i) set forth in subparagraph (a); or
(ii) for which mutual legal assistance was rendered under Article 1 (1 bis) of this Treaty;

(d) for any other purpose, if the evidence or information has been made public within the framework of proceedings for which they were transmitted, or in any of the situations described in subparagraphs (a), (b) and (c); and

(e) for any other purpose, only with the prior consent of the Requested Party.

3. (a) This Article shall not prejudice the ability of the Requested Party in accordance with this Treaty to impose additional conditions in a particular case where the particular request for assistance could not be complied with in the absence of such conditions. Where additional conditions have been imposed in accordance with this subparagraph, the Requested Party may require the Requesting Party to give information on the use made of the evidence or information.

(b) Generic restrictions with respect to the legal standards of the Requesting Party for processing personal data may not be imposed by the Requested Party as a condition under subparagraph (a) to providing evidence or information.

4. Where, following disclosure to the Requesting Party, the Requested Party becomes aware of circumstances that may cause it to seek an additional condition in a particular case, the Requested Party may consult with the Requesting Party to determine the extent to which the evidence or information can be protected.

ARTICLE 8 Taking Testimony and Producing Evidence in the Territory of the Requested Party

1. A person in the territory of the Requested Party from whom evidence is requested pursuant to this Treaty may be compelled, if necessary, to appear in order to testify or produce documents, records, or articles of evidence by subpoena or such other method as may be permitted under the law of the Requested Party.

2. A person requested to testify or to produce documentary information or articles in the territory of the Requested Party may be compelled to do so in accordance with the requirements of the law of the Requested Party. If such a person asserts a claim of immunity, incapacity or privilege under the laws of the Requesting Party, the evidence

shall nonetheless be taken and the claim be made known to the Requesting Party for resolution by the authorities of that Party.

3. Upon request, the Central Authority of the Requested Party shall furnish information in advance about the date and place of the taking of the evidence pursuant to this Article.

4. The Requested Party shall allow persons specified in the request to ask questions of the person whose testimony or evidence is being taken, through a legal representative qualified to appear before the courts of the Requested Party.

5. Documentary information produced pursuant to this Article may be authenticated by the attestation of a person competent to do so in the form indicated in Appendix A to this Treaty. No further authentication or certification shall be necessary in order for such documentary information to be admissible in evidence in proceedings in the territory of the Requesting Party. Documentary information produced pursuant to this Article may also be authenticated pursuant to such other form or manner as may be prescribed from time to time by either Central Authority.


ARTICLE 9 Records of Government Agencies

1. The Requested Party shall provide the Requesting Party with copies of publicly available records of government departments and agencies of the Requested Party.

2. The Requested Party may provide a copy of any record or information in the possession of a government department or agency but not publicly available to the same extent and on the same conditions as to its own law enforcement or judicial authorities. The Requested Party may refuse a request pursuant to this paragraph entirely or in part.

3. Official records provided pursuant to this Article shall be authenticated by the Central Authority of the Requested Party in the manner indicated in Appendix B to this Treaty. No further authentication or certification shall be necessary in order for such records to be admissible in evidence in proceedings in the territory of the Requesting Party. Records provided pursuant to this Article may also be authenticated pursuant to such other form or manner as may be prescribed from time to time by either Central Authority.


ARTICLE 10 Personal Appearance in the Territory of the Requesting Party

1. A request under this Treaty may seek assistance in facilitating the appearance of any person in the territory of the Requesting Party for the purpose of giving evidence before a court or of being identified in, or otherwise by his presence assisting, any proceedings.

2. The Central Authority of the Requested Party shall:
(a) ask a person whose voluntary appearance in the territory of the Requesting Party is desired whether he agrees to appear; and
(b) promptly inform the Central Authority of the Requesting Party of his answer.

3. If the Central Authority of the Requesting Party so indicates, a person agreeing to appear in the territory of the Requesting Party pursuant to this Article shall not be subject to service of process, or be detained or subjected to any restriction of personal liberty, by reason of any acts or convictions which preceded his departure from the territory of the Requested Party.

4. The safe conduct provided for by this Article shall cease fifteen days after the Central

Authority of the Requesting Party has notified the Central Authority of the Requested Party that the person's presence is no longer required, or if the person has left the territory of the Requesting Party and voluntarily returned to it.

## ARTICLE 11 Transfer of Persons in Custody

1. A person in the custody of one Party whose presence in the territory of the other Party is sought for the purpose of providing assistance under this Treaty shall be transferred for that purpose if the person and both Parties consent.

2. For the purposes of this Article:
(a) the Requesting Party shall be responsible for the safety of the person transferred and shall have the authority and the obligation to keep the person transferred in custody unless otherwise authorized by the Requested Party;
(b) the Requesting Party shall return the person transferred to the custody of the Requested Party as soon as circumstances permit and in any event no later than the date upon which he would have been released from custody in the territory of the Requested Party, unless otherwise agreed by both Central Authorities and the person transferred; and
(c) the Requesting Party shall not require the Requested Party to initiate extradition proceedings for the return of the person transferred.

## ARTICLE 12 Location or Identification of Persons

1. The Requested Party shall make best efforts to ascertain the location or identity of persons specified in the request.

2. The Central Authority of the Requested Party shall promptly communicate the results of its inquiries to the Central Authority of the Requesting Party.

## ARTICLE 13 Service of Documents

1. The Requested Party shall, as far as possible, effect service of any document relating to or forming part of any request for assistance properly made pursuant to this Treaty by the Requesting Party, including any subpoena or other process requiring the appearance of any person before any authority or tribunal in the territory of the Requesting Party.

2. Service of any subpoena or other process by virtue of paragraph (1) of this Article shall not impose any obligation under the law of the Requested Party to comply with it.

3. The Central Authority of the Requesting Party shall transmit any request for the service of a document requiring the appearance of a person before an authority in the Requesting Party a reasonable time before the scheduled appearance.

4. The Requested Party shall return a proof of service in the manner specified in the request.

## ARTICLE 14 Search and Seizure

1. The Requested Party shall execute a request for the search, seizure and delivery of any article to the Requesting Party if the request includes the information justifying such

action under the laws of the Requested Party and it is carried out in accordance with the laws of that Party.

2. The Requested Party may refuse a request if it relates to conduct in respect of which powers of search and seizure would not be exercisable in the territory of the Requested Party in similar circumstances.

3. Every official who has custody of a seized article shall certify the continuity of custody, the identity of the article and the integrity of its condition in the form indicated in Appendix C to this Treaty. No further authentication or certification shall be necessary in order to establish these matters in proceedings in the territory of the Requesting Party. Certification under this Article may also be provided in any other form or manner as may be prescribed from time to time by either Central Authority.

4. The Central Authority of the Requested Party may require that the Requesting Party agree to terms and conditions which the Requested Party may deem necessary to protect third party interests in the item to be transferred.

## ARTICLE 15 Return of Documents and Articles

The Central Authority of the Requesting Party shall return any documents or articles furnished to it in the execution of a request under this Treaty as soon as is practicable unless the Central Authority of the Requested Party waives the return of the documents or articles.

## ARTICLE 16 Assistance in Forfeiture Proceedings

1. The Parties shall assist each other in proceedings involving the identification, tracing, freezing, seizure or forfeiture of the proceeds and instrumentalities of crime and in relation to proceedings involving the imposition of fines related to a criminal prosecution.

2. If the Central Authority of one Party becomes aware that proceeds or instrumentalities are located in the territory of the other Party and may be liable to freezing, seizure or forfeiture under the laws of that Party, it may so inform the Central Authority of the other Party. If the Party so notified has jurisdiction, this information may be presented to its authorities for a determination whether any action is appropriate. The said authorities shall issue their decision in accordance with the laws of their country and the Central Authority of that country shall ensure that the other Party is aware of the action taken.

3. A Requested Party in control of forfeited proceeds or instrumentalities shall dispose of them according to its laws. Either Party may transfer forfeited assets or the proceeds of their sale to the other Party to the extent permitted by their respective laws, upon such terms as may be agreed.

## ARTICLE 16 bis Identification of Bank Information

1. (a) Upon request of the Requesting Party, the Requested Party shall, in accordance with the terms of this Article, promptly ascertain if the banks located in its territory possess information on whether an identified natural or legal person suspected of or charged with a criminal offence is the holder of a bank account or accounts. The Requested Party shall promptly communicate the results of its enquiries to the Requesting Party.

(b) The actions described in subparagraph (a) may also be taken for the purpose of identifying:

(i) information regarding natural or legal persons convicted of or otherwise involved in a criminal offence;

(ii) information in the possession of non-bank financial institutions; or

(iii) financial transactions unrelated to accounts.

2. In addition to the requirements of Article 4(2) of this Treaty, a request for information described in paragraph 1 shall include:

(a) the identity of the natural or legal person relevant to locating such accounts or transactions;

(b) sufficient information to enable the competent authority of the Requested Party to:
(i) reasonably suspect that the natural or legal person concerned has engaged in a criminal offence and that banks or non-bank financial institutions in the territory of the Requested Party may have the information requested; and
(ii) conclude that the information sought relates to the criminal investigation or proceeding; and

(c) to the extent possible, information concerning which bank or non-bank financial institution may be involved, and other information the availability of which may aid in reducing the breadth of the enquiry.

3. Unless subsequently modified by exchange of diplomatic notes between the European Union and the United States of America, requests for assistance under this Article shall be transmitted between:
(a) for the United Kingdom:
(i) The Lord Advocate, where the request relates only to Scotland;
(ii) The Secretary of State for Northern Ireland, where the request relates only to Northern Ireland;
(iii) The Secretary of State for the Home Department, in all other cases; and
(b) for the United States of America, the attaché responsible for the United Kingdom of the:
(i) U.S. Department of Justice, Drug Enforcement Administration, with respect to matters within its jurisdiction;
(ii) U.S. Department of Homeland Security, Bureau of Immigration and Customs Enforcement, with respect to matters within its jurisdiction;
(iii) U.S. Department of Justice, Federal Bureau of Investigation, with respect to all other matters.

4. The United States of America and the United Kingdom shall provide assistance under this Article with respect to money laundering and terrorist activity punishable under the laws of both the Requesting and Requested Parties, and with respect to such other criminal activity as to which they may notify each other.

5. The Requested Party shall respond to a request for production of the records concerning the accounts or transactions identified pursuant to this Article in accordance with the other provisions of this Treaty.

## ARTICLE 16 ter Joint Investigative Teams

1. Joint investigative teams may be established and operated in the respective territories of the United States of America and the United Kingdom for the purpose of facilitating

criminal investigations or prosecutions involving the United States of America and one or more Member States of the European Union where deemed appropriate by the United States of America and the United Kingdom.

2. The procedures under which the team is to operate, such as its composition, duration, location, organization, functions, purpose, and terms of participation of team members of a State in investigative activities taking place in another State's territory shall be as agreed between the competent authorities responsible for the investigation or prosecution of criminal offences, as determined by the respective States concerned.

3. The competent authorities determined by the respective States concerned shall communicate directly for the purposes of the establishment and operation of such team except that where the exceptional complexity, broad scope, or other circumstances involved are deemed to require more central coordination as to some or all aspects, the States may agree upon other appropriate channels of communications to that end.

4. Where the joint investigative team needs investigative measures to be taken in one of the States setting up the team, a member of the team of that State may request its own competent authorities to take those measures without the other States having to submit a request for mutual legal assistance. The required legal standard for obtaining the measure in that State shall be the standard applicable to its domestic investigative activities.

## ARTICLE 16 quater Video Conferencing

1. The use of video transmission technology shall be available between the United States of America and the United Kingdom for taking testimony in a proceeding for which mutual legal assistance is available of a witness or expert located in the Requested Party. To the extent not specifically set forth in this Article, the modalities governing such procedure shall be as otherwise provided under this Treaty.

2. The Requesting and Requested Parties may consult in order to facilitate resolution of legal, technical or logistical issues that may arise in the execution of the request.

3. Without prejudice to any jurisdiction under the law of the Requesting Party, making an intentionally false statement or other misconduct of the witness or expert during the course of the video conference shall be punishable in the Requested Party in the same manner as if it had been committed in the course of its domestic proceedings.

4. This Article is without prejudice to the use of other means for obtaining of testimony in the Requested Party available under applicable treaty or law.

5. The Requested Party may permit the use of video conferencing technology for purposes other than those described in paragraph 1 of this Article, including for purposes of identification of persons or objects, or taking of investigative statements.

## ARTICLE 17 Compatibility with Other Arrangements

Assistance and procedures set forth in this Treaty shall not prevent either of the Parties from granting assistance to the other Party through the provisions of other international agreements to which it may be a party, or through the provisions of its national laws. The Parties may also provide assistance pursuant to any arrangement, agreement, or practice which may be applicable between the law enforcement agencies of the Parties.

## ARTICLE 18 Consultation

1. The Parties, or Central Authorities, shall consult promptly, at the request of either, concerning the implementation of this Treaty either generally or in relation to a particular case. Such consultation may in particular take place if, in the opinion of either Party or Central Authority, the expenses or other resources required for the implementation of this Treaty are of an extraordinary nature, or if either Party has rights or obligations under another bilateral or multilateral agreement relating to the subject matter of this Treaty.

2. With respect to any matter for which assistance could be granted under this Treaty, neither Party shall enforce any compulsory measure requiring an action to be performed by any person located in the territory of the other Party, unless the Party proposing such enforcement has first exhausted the procedures established in paragraphs (3) and (4) of this Article.

3. If a Party is aware that its authorities are intending to take measures referred to in paragraph (2) of this Article, its Central Authority shall inform the other Central Authority, who may request consultations. If the other Party is aware of or considers that the authorities of the first Party have taken or are about to take any such measures, its Central Authority may request consultations. Thereafter, the Central Authorities shall consult with a view to determining whether the assistance sought can be provided under this Treaty, or otherwise resolving the matter.

4. Where consultations fail to resolve the matter, or unreasonable delay may be jeopardizing the successful completion of a proceeding, either Central Authority may give the other written notice to that effect.

5. Unless otherwise agreed by the Parties, the obligations under paragraphs (2), (3) and (4) of this Article shall have been fulfilled 21 days after receipt of this written notice, provided that this is not less than 60 days after receipt of the request referred to in paragraph (3) above.

6. Even in those cases in which the Parties' obligations under this Article have been fulfilled, each Party shall continue to exercise moderation and restraint.

## ARTICLE 19 Definition

For the purposes of this Treaty, "proceedings" means proceedings related to criminal matters and includes any measure or step taken in connection with the investigation or prosecution of criminal offences, including the freezing, seizure or forfeiture of the proceeds and instrumentalities of crime, and the imposition of fines related to a criminal prosecution.

## ARTICLE 20 Termination

Either Party may terminate this Treaty by means of a written notice to the other Party. Termination shall take effect six months following the date of notification.

Appendix A

## CERTIFICATE OF AUTHENTICITY OF BUSINESS RECORDS

I,(Name), attest on penalty of criminal punishment for false statement or false attestation that I am employed by (Name of Business from which documents are produced) and that my official title is (Official Title). I further state that each of the records attached hereto is the original or a duplicate of the original of records in the custody of (Name of Business from which documents are produced). I further state that:

A) such records were made at or near the time of the occurrence of the matters set forth, by (or from information transmitted by) a person with knowledge of those, matters;

B) such records were kept in the course of a regularly conducted business activity;

C) the business activity made the records as a regular practice; and

D) if any of such records is not the original, such record is a duplicate of the original.

_____

_____
(Signature)   (Date)

Sworn to or affirmed before me, _____(Name), a
_____(notary
_____, 20___.
public, judicial officer, etc.), this _____ day of _____, 20___.

Appendix B

## ATTESTATION OF AUTHENTICITY OF FOREIGN PUBLIC DOCUMENTS

I, (Name), attest on penalty of criminal punishment for false statement or attestation that my position with the Government of (Country) is (Official Title) and that in that position I am authorized by the law of (Country) to attest that the documents attached and described below are true and accurate copies of original official records which are recorded or filed in (Name of Office or Agency) which is a government office or agency of the Government of (Country).

Description of Documents:

__

     (Signature)

_____
(Title)
_____
(Date)

Appendix C

## ATTESTATION WITH RESPECT TO SEIZED ARTICLES

I, (Name), attest on penalty of criminal punishment for false statement or attestation that my position with the Government of (Country) is (Title), I received custody of the articles listed below from (Name of Person) on (Date), at (Place), I relinquished custody of the articles listed below to (Name of Person) on (Date) at (Place) in the same condition as when I received them (or if different, as noted below).

Description of Articles:

Changes in condition while in my custody:

Official Seal

---
(Signature)

---
(Title)

---
(Place)

---
(Date)

No. 121

The Embassy of the United States of America at London, England, presents its compliments to Her Majesty's Principal Secretary of State for Foreign and Commonwealth Affairs and has the honor to refer to the Instrument as contemplated by Article 3(2) of the Agreement on Mutual Legal Assistance between the United States of America and the European Union signed June 25, 2003, as to the application of the Treaty on Mutual Legal Assistance in Criminal Matters between the Government of the United States of America and the Government of the United Kingdom of Great Britain and Northern Ireland signed January 6, 1994.

The Embassy wishes to confirm that two exchanges of Notes related to the 1994 Treaty, one done simultaneous with its signature and the other done on April 30 and May 1, 2001, shall remain the understandings of the Governments with respect to this Instrument, until such time as they may agree otherwise.

If the foregoing is acceptable to your Government, the Embassy has the honor to propose that this Note and your Note in reply shall constitute an agreement between our two Governments, which shall enter into force on the date of entry into force of the Instrument.

The Embassy avails itself of the opportunity to express to Her Majesty's Principal Secretary of State for Foreign and Commonwealth Affairs the renewed assurance of its highest consideration.

Embassy of the United States of America London, England. December 16, 2004

No. 120

The Embassy of the United States of America at London, England, presents its compliments to Her Majesty's Principal Secretary of State for Foreign and Commonwealth Affairs and has the honor to refer to the Instrument as contemplated by Article 3(2) of the Agreement on Extradition between the United States of America and the European Union signed June 25, 2003, as to the application of the Extradition Treaty between the Government of the United States of America and the Government of the United Kingdom of Great Britain and Northern Ireland signed March 31, 2003 (the "2003 Extradition Treaty").

Having been informed by the Government of the United Kingdom of Great Britain and Northern Ireland that it will be unable to apply Article 5(2) of the Agreement on Extradition between the United States of America and the European Union, as set forth in Article 9 of the Annex to the Instrument, relating to authentication of extradition documents, until a corresponding change is made in its domestic law governing extradition, the Embassy has the honor to propose on behalf of the United States Government as follows:

Article 5(2) of the Agreement on Extradition between the United States of America and the European Union, as set forth in Article 9 of the Annex to the Instrument, shall not be applied until the Government of the United States of America and the Government of the United Kingdom of Great Britain and Northern Ireland indicate in a subsequent exchange of notes that the required internal procedures have been completed. Until that time, the parties agree to apply the procedure for authentication of extradition documents set forth in Article 9 of the Extradition Treaty between the Government of the United States of America and the Government of the United Kingdom of Great Britain and Northern Ireland signed March 31, 2003, upon its entry into force. The Government of the United Kingdom of Great Britain and Northern Ireland shall undertake to seek the necessary legislation at the earliest possible time.

The Embassy also wishes to confirm that two exchanges of letters related to the 2003 Extradition Treaty and done simultaneous with its signature shall remain the understandings of the Governments with respect to this Instrument, until such time as they may agree otherwise.

If the foregoing is acceptable to your Government, the Embassy has the honor to propose that this Note and your Note in reply shall constitute an agreement between our two Governments, which shall enter into force on the date of entry into force of the Instrument.

The Embassy avails itself of the opportunity to express to Her Majesty's Principal Secretary of State for Foreign and Commonwealth Affairs the renewed assurance of its highest consideration.

Embassy of the United States of America London, England. December 16, 2004